SOLEM, WARDEN, SOUTH DAKOTA STATE
PENITENTIARY, ET AL. *v.* BARTLETT

No. 82–1253.   Argued December 7, 1983—Decided February 22, 1984

MARSHALL, J., delivered the opinion for a unanimous Court.

*Mark V. Meierhenry,* Attorney General of South Dakota, *pro se,* argued the cause for petitioners. With him on the briefs was *Mark Smith,* Assistant Attorney General.

*Tom D. Tobin* argued the cause for the County of Dewey, South Dakota, et al. as *amici curiae* urging reversal. With him on the brief were *William W. Shakely* and *David Albert Mustone.*

*Arlinda F. Locklear* argued the cause for respondent. With her on the brief were *Terry L. Pechota* and *Richard B. Collins.**

JUSTICE MARSHALL delivered the opinion of the Court.

On May 29, 1908, Congress authorized the Secretary of the Interior to open 1.6 million acres of the Cheyenne River Sioux Reservation for homesteading. Act of May 29, 1908, ch. 218, 35 Stat. 460 *et seq.* (Act or Cheyenne River Act). The question presented in this case is whether that Act of Congress diminished the boundaries of the Cheyenne River Sioux Reservation or simply permitted non-Indians to settle within existing reservation boundaries.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Minnesota by *Hubert H. Humphrey III,* Attorney General, and *James M. Schoessler,* Special Assistant Attorney General; and for the County of Duchesne, Utah, et al. by *Dennis L. Draney, Tom Slorby,* and *John Frederick.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Lee, Acting Assistant Attorney General Habicht, Deputy Solicitor General Claiborne,* and *David C. Shilton;* and for the Cheyenne River Sioux Tribe, South Dakota, et al., by *W. Richard West, Jr., Arthur Lazarus, Jr., Reid Peyton Chambers,* and *William R. Perry.*

## I

In 1979, the State of South Dakota charged respondent John Bartlett, an enrolled member of the Cheyenne River Sioux Tribe, with attempted rape. Respondent pleaded guilty to the charge, and was sentenced to a 10-year term in the state penitentiary at Sioux Falls. After exhausting state remedies, respondent filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the District of South Dakota. Respondent contended that the crime for which he had been convicted occurred within the Cheyenne River Sioux Reservation, established by Congress in the Act of Mar. 2, 1889, ch. 405, § 4, 25 Stat. 889; that, although on May 29, 1908, Congress opened for settlement by non-Indians the portion of the reservation on which respondent committed his crime, the opened portion nonetheless remained Indian country;[1] and that the State therefore lacked criminal jurisdiction over respondent.[2]

---

[1] "Indian country" is defined in 18 U. S. C. § 1151 (1982 ed.) to mean "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

[2] Title 18 U. S. C. § 1153 provides: "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, . . . assault with intent to commit rape . . . within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." Within Indian country, state jurisdiction is limited to crimes by non-Indians against non-Indians, see *New York ex rel. Ray* v. *Martin*, 326 U. S. 496 (1946), and victimless crimes by non-Indians. Tribes exercise concurrent jurisdiction over certain minor crimes by Indians, 18 U. S. C. §§ 1152, 1153, unless a State has assumed jurisdiction under § 1162.

Relying on previous decisions of the Eighth Circuit dealing with the Act of May 29, 1908,[3] the District Court accepted respondent's claim that the Act had not diminished the original Cheyenne River Sioux Reservation, and issued a writ of habeas corpus. On appeal, the Eighth Circuit, sitting en banc, affirmed, two judges dissenting. 691 F. 2d 420 (1982). Because the Supreme Court of South Dakota has issued a pair of opinions offering a conflicting interpretation of the Act of May 29, 1908,[4] we granted certiorari. 461 U. S. 956 (1983). We now affirm.

## II

In the latter half of the 19th century, large sections of the Western States and Territories were set aside for Indian reservations. Towards the end of the century, however, Congress increasingly adhered to the view that the Indian tribes should abandon their nomadic lives on the communal reservations and settle into an agrarian economy on privately owned parcels of land.[5] This shift was fueled in part by the belief that individualized farming would speed the Indians' assimilation into American society and in part by the continuing demand for new lands for the waves of homesteaders moving west.[6] As a result of these combined pressures, Congress

---

[3] *United States* v. *Dupris,* 612 F. 2d 319 (1979), vacated and remanded on other grounds, 446 U. S. 980 (1980); *United States* v. *Long Elk,* 565 F. 2d 1032 (1977); *United States ex rel. Condon* v. *Erickson,* 478 F. 2d 684 (1973).

[4] See *State* v. *Janis,* 317 N. W. 2d 133 (1982); *Stankey* v. *Waddell,* 256 N. W. 2d 117 (1977).

[5] An account of the movement and its effect on the Cheyenne River Sioux Tribe appears in F. Hoxie, Jurisdiction on the Cheyenne River Indian Reservation: An Analysis of the Causes and Consequences of the Act of May 29, 1908, pp. 1–30 (undated manuscript) (hereinafter Hoxie), which was prepared for presentation in *United States* v. *Dupris, supra,* and incorporated into the record of this case. See also Note, Jurisdictional Confusion on the Cheyenne River Indian Reservation: *United States* v. *Dupris,* 25 S. D. L. Rev. 355 (1980).

[6] See F. Cohen, Handbook of Federal Indian Law 127–134 (1982 ed.). The amount of surplus lands freed up by moving Indians onto individual

passed a series of surplus land Acts at the turn of the century to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement. Initially, Congress legislated its Indian allotment program on a national scale,[7] but by the time of the Act of May 29, 1908, Congress was dealing with the surplus land question on a reservation-by-reservation basis, with each surplus land Act employing its own statutory language, the product of a unique set of tribal negotiation and legislative compromise.

The modern legacy of the surplus land Acts has been a spate of jurisdictional disputes between state and federal officials as to which sovereign has authority over lands that were opened by the Acts and have since passed out of Indian ownership.[8] As a doctrinal matter, the States have jurisdiction over unallotted opened lands if the applicable surplus land Act freed that land of its reservation status and thereby diminished the reservation boundaries. On the other hand, federal, state, and tribal authorities share jurisdiction over these lands if the relevant surplus land Act did not diminish the existing Indian reservation because the entire opened area is Indian country under 18 U. S. C. § 1151(a) (1982 ed.). See nn. 1 and 2, *supra.*

---

allotments was considerable. For instance, in 1908, the 2,620 members of the Cheyenne River Sioux Tribe had over 2.8 million acres of reservation land, or over 1,000 acres per tribal member. Under the allotment program, the average allotment per member was under 500 acres. See S. Rep. No. 439, 60th Cong., 1st Sess., pt. 1, p. 4 (1908); Hoxie 38, 40.

[7] See, *e. g.,* General Allotment Act of 1887, ch. 119, 24 Stat. 388 *et seq.*

[8] Regardless of whether the original reservation was diminished, federal and tribal courts have exclusive jurisdiction over those portions of the opened lands that were and have remained Indian allotments. See 18 U. S. C. § 1151(c) (1982 ed.). In addition, opened lands that have been restored to reservation status by subsequent Acts of Congress, see, *e. g.,* Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified at 25 U. S. C. § 461 *et seq.* (1982 ed.) (authorizing the return of opened lands to the original reservations)), fall within the exclusive criminal jurisdiction of federal and tribal courts under 18 U. S. C. §§ 1152, 1153.

Unfortunately, the surplus land Acts themselves seldom detail whether opened lands retained reservation status or were divested of all Indian interests. When the surplus land Acts were passed, the distinction seemed unimportant. The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century. Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians. See *Bates* v. *Clark*, 95 U. S. 204 (1877); *Ash Sheep Co.* v. *United States*, 252 U. S. 159 (1920). Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries. See Act of June 25, 1948, ch. 645, 62 Stat. 757 (codified at 18 U. S. C. § 1151 (1982 ed.)).

Another reason why Congress did not concern itself with the effect of surplus land Acts on reservation boundaries was the turn-of-the-century assumption that Indian reservations were a thing of the past. Consistent with prevailing wisdom, Members of Congress voting on the surplus land Acts believed to a man that within a short time—within a generation at most—the Indian tribes would enter traditional American society and the reservation system would cease to exist.[9] Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation.

Although the Congresses that passed the surplus land Acts anticipated the imminent demise of the reservation and, in fact, passed the Acts partially to facilitate the process, we have never been willing to extrapolate from this expectation

---

[9] See *Montana* v. *United States*, 450 U. S. 544, 559–560, n. 9 (1981); Hoxie 1–20. Congress rejected the policy of allotment and surplus land sales in 1934. Indian Reorganization Act, 48 Stat. 984 *et seq.*

a specific congressional purpose of diminishing reservations with the passage of every surplus land Act. Rather, it is settled law that some surplus land Acts diminished reservations, see, *e. g.*, *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584 (1977); *DeCoteau* v. *District County Court*, 420 U. S. 425 (1975), and other surplus land Acts did not, see, *e. g.*, *Mattz* v. *Arnett*, 412 U. S. 481 (1973); *Seymour* v. *Superintendent*, 368 U. S. 351 (1962). The effect of any given surplus land Act depends on the language of the Act and the circumstances underlying its passage.[10]

---

[10] At one extreme, for example, the Act of Mar. 3, 1891, ch. 543, 26 Stat. 1035 *et seq.*, expressly stated that the Lake Traverse Indian Tribe agreed to "cede, sell, relinquish and convey" all interest in unallotted lands on the Lake Traverse Indian Reservation, and the Act further provided that the Tribe would receive full compensation in consideration for its loss. In *DeCoteau* v. *District County Court*, we found that the Lake Traverse Act, with its express language of cession, diminished the Lake Traverse Indian Reservation. At the other extreme, the Act of Mar. 22, 1906, ch. 1126, § 1, 34 Stat. 80, simply authorized the Secretary of the Interior "to sell or dispose of" unallotted lands on a portion of the Colville Indian Reservation; under the Act, the Colville Tribe received whatever proceeds these sales generated, rather than a sum certain. § 9, 34 Stat. 81. In *Seymour* v. *Superintendent*, 368 U. S., at 356, we held that, because the Colville Act lacked an unconditional divestiture of Indian interest in the lands, the Act simply opened a portion of the Colville Reservation to non-Indian settlers and did not diminish the reservation. See also *Mattz* v. *Arnett*, 412 U. S., at 497.

Between these extremes was the case of the Rosebud Sioux Reservation. In 1901, the Rosebud Sioux Tribe voted in favor of an agreement to cede a portion of their land in Gregory County to the United States in exchange for a sum certain. Three years later, Congress passed the Act of Apr. 23, 1904, ch. 1484, 33 Stat. 254–258, which incorporated the agreement's cession language, but replaced sum-certain payment with a provision guaranteeing the Tribe only the proceeds from the sale of the opened lands. Over the following years, Congress passed two more surplus land Acts involving Rosebud Reservation land in other counties; each of the subsequent Acts authorized the sale and disposal of additional lands and promised the tribes the proceeds of the sales. See Act of Mar. 2, 1907, ch. 2536, 34 Stat. 1230–1232; Act of May 30, 1910, ch. 260, 36 Stat. 448–452. Although none of the Rosebud Acts clearly severed the Tribe from its in-

Our precedents in the area have established a fairly clean analytical structure for distinguishing those surplus land Acts that diminished reservations from those Acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries. The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise. See *United States* v. *Celestine*, 215 U. S. 278, 285 (1909).[11]

Diminishment, moreover, will not be lightly inferred. Our analysis of surplus land Acts requires that Congress clearly evince an "intent . . . to change . . . boundaries" before diminishment will be found. *Rosebud Sioux Tribe* v. *Kneip*, *supra*, at 615. The most probative evidence of congressional intent is the statutory language used to open the Indian lands. Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands. *DeCoteau* v. *District County Court, supra*, at 444–445; *Seymour* v. *Superintendent, supra*, at 355. When such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for

---

terest in the unallotted opened lands and even though the last two Acts were strikingly similar to the 1906 Act found not to have diminished the Colville Reservation in *Seymour* v. *Superintendent, supra*, this Court held that the circumstances surrounding the passage of the three Rosebud Acts unequivocally demonstrated that Congress meant for each Act to diminish the Rosebud Reservation. *Rosebud Sioux Tribe* v. *Kneip.*

[11] At one time, it was thought that Indian consent was needed to diminish a reservation, but in *Lone Wolf* v. *Hitchcock*, 187 U. S. 553 (1903), this Court decided that Congress could diminish reservations unilaterally.

the tribe's reservation to be diminished.  See *DeCoteau* v. *District County Court, supra,* at 447–448.

As our opinion in *Rosebud Sioux Tribe* demonstrates, however, see n. 10, *supra,* explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment.  When events surrounding the passage of a surplus land Act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative Reports presented to Congress—unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged.  To a lesser extent, we have also looked to events that occurred after the passage of a surplus land Act to decipher Congress' intentions.  Congress' own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unallotted open lands.

On a more pragmatic level, we have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation.  Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that *de facto,* if not *de jure,* diminishment may have occurred.  See *Rosebud Sioux Tribe* v. *Kneip, supra,* at 588, n. 3, and 604–605; *DeCoteau* v. *District County Court, supra,* at 428.  In addition to the obvious practical advantages of acquiescing to *de facto* diminishment,[12] we look to the subsequent demo-

---

[12] When an area is predominately populated by non-Indians with only a few surviving pockets of Indian allotments, finding that the land remains Indian country seriously burdens the administration of state and local

graphic history of opened lands as one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers.[13]

There are, of course, limits to how far we will go to decipher Congress' intention in any particular surplus land Act. When both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening. *Mattz* v. *Arnett*, 412 U. S., at 505; *Seymour* v. *Superintendent*, 368 U. S. 351 (1962).

## III

### A

We now turn to apply these principles to the Act of May 29, 1908. We begin with the Act's operative language, which reads:

> "[T]he Secretary of the Interior . . . is hereby . . . authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Cheyenne River and Standing Rock[14] Indian reservations in the States of

governments. See *Rosebud Sioux Tribe* v. *Kneip; DeCoteau* v. *District County Court.* Conversely, problems of an imbalanced checkerboard jurisdiction arise if a largely Indian opened area is found to be outside Indian country. See *Seymour* v. *Superintendent*, 368 U. S., at 358.

[13] Resort to subsequent demographic history is, of course, an unorthodox and potentially unreliable method of statutory interpretation. However, in the area of surplus land Acts, where various factors kept Congress from focusing on the diminishment issue, see *supra*, at 468, the technique is a necessary expedient.

[14] As this language reveals, the Act dealt with land on two bordering Sioux reservations. Although for purposes of this case we are only concerned with the Act's effect on the Cheyenne River Reservation, nothing in the record leads us to suspect that Congress intended the Act to have a different effect on the Standing Rock Reservation.

South Dakota and North Dakota lying and being within the following described boundaries . . . .

. . . . .

"[F]rom the proceeds arising from the sale and disposition of the lands aforesaid, exclusive of the customary fees and commissions, there shall be deposited in the Treasury of the United States, to the credit of the Indians belonging and having tribal rights on the reservation aforesaid in the States of South Dakota and North Dakota the sums to which the respective tribes may be entitled . . . ."   Ch. 218, §§ 1, 6, 35 Stat. 460–461, 463.

These provisions stand in sharp contrast to the explicit language of cession employed in the Lake Traverse and 1904 Rosebud Acts discussed in our opinions in *DeCoteau* and *Rosebud Sioux Tribe*.   See n. 10, *supra*.   Rather than reciting an Indian agreement to "cede, sell, relinquish and convey" the opened lands, the Cheyenne River Act simply authorizes the Secretary to "sell and dispose" of certain lands. This reference to the sale of Indian lands, coupled with the creation of Indian accounts for proceeds, suggests that the Secretary of the Interior was simply being authorized to act as the Tribe's sales agent.   Indeed, when faced with precisely the same language in *Seymour* v. *Superintendent*, *supra*, at 356, we concluded that such provisions "did no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." [15]

---

[15] As petitioners stress, the operative language of the Cheyenne River Act is also similar to language in the 1907 and 1910 Rosebud Acts, which this Court held diminished the Rosebud Sioux Reservation.   Our analysis of Rosebud Acts, however, was strongly colored by the existence of a 1904 Rosebud Act containing cession language "precisely suited" to disestablishment, and the admission of the Indians that the second two Rosebud Acts must have diminished their reservation if the previous Act did.   *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S., at 597, 606, and n. 29; see n. 10, *supra*.

The balance of the Cheyenne River Act is largely consistent with the implication of the operative language that the Act opened but did not diminish the Cheyenne River Sioux Reservation. Nowhere else in the Act is there specific reference to the cession of Indian interests in the opened lands or any change in existing reservation boundaries. In fact, certain provisions of the Act strongly suggest that the unallotted opened lands would for the immediate future remain an integral part of the Cheyenne River Reservation. In § 1 of the Act, the Secretary was authorized to set aside portions of the opened lands "for agency, school, and religious purposes, to remain reserved as long as needed, and as long as agency, school, or religious institutions are maintained thereon for the benefit of said Indians." 35 Stat. 461. It is difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation. This interpretation is supported by § 2 of the Act, under which Cheyenne River Indians were given permission to continue to obtain individual allotments on the affected portion of the reservation before the land was officially opened to non-Indian settlers. *Id.*, at 462–463. Also in § 2, Congress instructed the Geological Survey to examine the opened area for "lands bearing coal" and exempted those sections from allotment or disposal, the apparent purpose being to reserve those mineral resources for the whole Tribe. *Id.*, at 462; see S. Rep. No. 439, 60th Cong., 1st Sess., pt. 1, p. 6 (1908).

This case is made more difficult, however, by the presence of some language in the Cheyenne River Act that indirectly supports petitioners' view that the reservation was diminished. For instance, in a provision permitting Indians already holding an allotment on the opened lands to obtain new allotments in the unopened territories, the Act refers to the unopened territories as "within the respective reservations thus diminished." § 2, 35 Stat. 461. Elsewhere, the Act permits tribal members to harvest timber on certain parts of

the opened lands, but conditions the grant for "only as long as the lands remain part of the public domain." § 9, 35 Stat. 464. On the assumption that Congress would refer to opened lands as being part of the public domain only if the lands had lost all vestiges of reservation status, petitioners and several *amici* point to the term "public domain" as well as the phrase "reservations thus diminished" as evidence that Congress understood the Cheyenne River Act to divest unallotted open lands of their reservation status.[16]

Undisputedly, the references to the opened areas as being in "the public domain" and the unopened areas as constituting "the reservation thus diminished" support petitioners' view that the Cheyenne River Act diminished the reservation. These isolated phrases, however, are hardly dispositive.[17] And, when balanced against the Cheyenne River Act's stated and limited goal of opening up reservation lands for sale to non-Indian settlers, these two phrases cannot carry the burden of establishing an express congressional purpose to diminish. Cf. *Mattz* v. *Arnett*, 412 U. S., at 497–499.[18] The

---

[16] See Brief for Petitioners 19–24; Brief for Counties of Dewey et al. as *Amici Curiae* 12–14; Brief for Counties of Duchesne et al. as *Amici Curiae* 39–45.

[17] There is also considerable doubt as to what Congress meant in using these phrases. In 1908, "diminished" was not yet a term of art in Indian law. When Congress spoke of the "reservation thus diminished," it may well have been referring to diminishment in common lands and not diminishment of reservation boundaries. See *United States el rel. Condon* v. *Erickson*, 478 F. 2d, at 687. Similarly, even without diminishment, unallotted opened lands could be conceived of as being in the "public domain" inasmuch as they were available for settlement.

[18] Both the South Dakota Supreme Court and dissenting judges from the Eighth Circuit have found further support for diminishment in the so-called school lands provision and a subsequently enacted liquor prohibition for the opened lands. *Stankey* v. *Waddell*, 256 N. W. 2d, at 121, 126; *United States* v. *Dupris*, 612 F. 2d, at 334; see Act of May 29, 1908, ch. 218, § 7, 35 Stat. 463 (school land provision); Act of Feb. 17, 1910, ch. 40, 36 Stat. 196–197 (liquor prohibition Act). Although we credited similar provisions as supportive of our holding in *Rosebud Sioux Tribe* v. *Kneip*,

Act of May 29, 1908, read as a whole, does not present an explicit expression of congressional intent to diminish the Cheyenne River Sioux Reservation.[19]

## B

The circumstances surrounding the passage of the Cheyenne River Act also fail to establish a clear congressional purpose to diminish the reservation. In contrast to the Lake Traverse Act and 1904 Rosebud Act, the Cheyenne River Act did not begin with an agreement between the United States and the Indian Tribes, in which the Indians agreed to cede a portion of their territory to the Federal Government.[20] The Cheyenne River Act had its origins in "[a] bill to authorize the sale and disposition of a portion of the surplus and unallotted lands in the Cheyenne River and Standing Rock Indian reservations," introduced by Senator Gamble of South Dakota on December 9, 1907. S. 1385, 60th Cong., 1st Sess. (1907). Once the bill was under consideration, the Secretary of the Interior dispatched an Inspector McLaughlin to the two affected reservations to consult with the Tribes about the bills.

During his meeting with members of the Cheyenne River Tribe, Inspector McLaughlin admittedly spoke in terms of cession and the relinquishment of Indian interests in the opened territories. However, it is impossible to say that

_supra_, at 605–615, inferences from these provisions were obviously of secondary importance to our decision, see nn. 10 and 15, _supra_. Moreover, as independent evidence of a congressional intention to diminish, such evidence is suspect. See Brief for United States as _Amicus Curiae_ 14, n. 14, 16, n. 16; see also 430 U. S., at 623, n. 12 (MARSHALL, J., dissenting).

[19] Read as authorizing the Secretary to serve as the Tribe's sales agent, the Act fulfills Congress' original plan that the surplus lands of the Cheyenne River Sioux Reservation could be sold off once members of the Tribe moved onto allotment lands. See Act of Mar. 2, 1889, ch. 405, § 12, 25 Stat. 892.

[20] See _Rosebud Sioux Tribe_ v. _Kneip_, 430 U. S., at 589–598; _DeCoteau_ v. _District County Court_, 420 U. S., at 436–444.

the Tribe agreed to the terms that McLaughlin presented. Due to bad weather during McLaughlin's visit, only 63 members of the Tribe attended his meeting. At the close of McLaughlin's presentation, the president of the Cheyenne River Business Council said that he would have to discuss the matter with the entire Tribe before he could respond to the proposed bill. McLaughlin agreed to delay submission of his report to Congress until he had received word from the Tribe, but, when the Tribe's vote had not reached Washington 14 days later, McLaughlin sent his report to Congress with the conclusion: "The general sentiment of the Indians in council with me at the agency was in favor of the relinquishment [of the opened lands]." H. R. Rep. No. 1539, 60th Cong., 1st Sess., 7 (1908); see *id.*, at 23–24, 28. McLaughlin, however, also informed Congress of the low attendance at his meeting with the Cheyenne River Tribe and acknowledged that he had never received formal approval from the Tribe. *Id.*, at 8.

With a full report of Inspector McLaughlin's meeting with the Cheyenne River Tribe before it, Congress considered the Cheyenne River Act in April and May 1908. In neither floor debates nor legislative Reports is there a clear statement that Congress interpreted Inspector McLaughlin's report to establish an agreement on the part of the Cheyenne River Indians to cede the opened areas.[21] Indeed, the most explicit statement of Congress' view of the Indian's position was: "The Indians upon both reservations are satisfied to have the surplus and unallotted lands disposed of under the provisions of the bill as amended." S. Rep. No. 439, 60th Cong., 1st Sess., pt. 1, p. 4 (1908), quoted and adopted in H. R. Rep. No. 1539, 60th Cong., 1st Sess., 3 (1908). For the most part,

---

[21] One reason why Congress may not have interpreted the McLaughlin report as evidence of tribal agreement to cede the land is that a delegation from the Tribe followed McLaughlin back to Washington to urge Congress not to pass the proposed legislation. See Hoxie 55–56. The particulars of the delegation's trip are not known.

the legislative debate of the Cheyenne River Act centered on how much money the Indians would be paid for certain sections of the opened area that the United States was going to buy for school lands, and no mention was made of the Act's effect on the reservation's boundaries or whether state or federal officials would have jurisdiction over the opened areas. See 42 Cong. Rec. 4753–4755 (1908) (Senate debate); *id.*, at 7003–7007 (House debate).

To be sure, there are a few phrases scattered through the legislative history of the Cheyenne River Act that support petitioners' position. Both the Senate and House Reports refer to the "reduced reservation" and state that "lands reserved for the use of the Indians upon both reservations as diminished . . . are ample . . . for the present and future needs of the Indians of the respective tribes." S. Rep. No. 439, *supra*, pt. 1, at 4, quoted and adopted in H. R. Rep. No. 1539, *supra*, at 3. However, it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate. See also n. 17, *supra*. Without evidence that Congress understood itself to be entering into an agreement under which the Tribe committed itself to cede and relinquish all interests in unallotted opened lands, and in the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish the Cheyenne River Sioux Reservation.

## C

The subsequent treatment of the Cheyenne River Sioux Reservation by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side. For instance, two years after the Cheyenne River Act, Congress passed a bill to sell a portion of the

opened lands and called the area "surplus and unallotted lands *in the Cheyenne River Indian Reservation*," suggesting that the opened area was still part of the reservation. Act of June 23, 1910, ch. 369, 36 Stat. 602 (emphasis added). But, 12 years after that, Congress passed another piece of legislation referring to the opened lands as "the former" Cheyenne River Sioux Reservation and suggesting that the reservation had been diminished. See Act of Apr. 25, 1922, ch. 140, 42 Stat. 499. Ample additional examples pointing in both directions leave one with the distinct impression that subsequent Congresses had no clear view whether the opened territories were or were not still part of the Cheyenne River Reservation. A similar state of confusion characterizes the Executive's treatment of the Cheyenne River Sioux Reservation's opened lands.[22] Moreover, both parties have been able to cite instances in which state and federal courts exerted criminal jurisdiction over the disputed area in the years following opening.[23] Neither sovereign dominated the jurisdictional history of the opened lands in the decades immediately following 1908.

What is clear, however, is what happened to the Cheyenne River Sioux Tribe after the Act of May 29, 1908, was passed.

---

[22] An exhaustive list of administrative documents supporting petitioners' position is collected in App. B to Brief for Counties of Dewey et al., as *Amici Curiae* in No. 82–1582 (CA8). Additional administrative documents supporting respondent's position can be found in Hoxie 87–92.

[23] According to one study, federal, tribal, and state courts shared jurisdiction over the opened areas in the decades following opening. Hoxie 100–128. Between 1910 and 1920, only two Indians were tried in state court for crimes committed on the opened lands. *Id.*, at 128. During this period, the federal authorities were primarily responsible for Indian life on both opened and unopened portions of the reservation. In later years, however, the state courts came to assume that the opened areas fell within their general criminal jurisdiction. See, *e. g.*, *State* v. *Barnes*, 81 S. D. 511, 137 N. W. 2d 683 (1965). It was only in 1973 that the Eighth Circuit challenged this assumption in *United States ex rel. Condon* v. *Erickson*, 478 F. 2d 684.

Most of the members of the Tribe obtained individual allotments on the lands opened by the Act.[24]  Because most of the Tribe lived on the opened territories, tribal authorities and Bureau of Indian Affairs personnel took primary responsibility for policing and supplying social services to the opened lands during the years following 1908.[25]  The strong tribal presence in the opened area has continued until the present day.  Now roughly two-thirds of the Tribe's enrolled members live in the opened area.  The seat of tribal government is now located in a town in the opened area, where most important tribal activities take place.

Also clear is the historical fact that the opening of the Cheyenne River Sioux Reservation was a failure.  Few homesteaders perfected claims on the lands, due perhaps in part to the price of the land but probably more importantly to the fact that the opened area was much less fertile than the lands in southern South Dakota opened by other surplus land Acts.[26]  As a result of the small number of homesteaders who settled on the opened lands and the high percentage of tribal members who continue to live in the area, the population of the disputed area is now evenly divided between Indian and non-Indian residents.  Under these circumstances, it is impossible to say that the opened areas of the Cheyenne River Sioux Reservation have lost their Indian character.

---

[24] Hoxie 38 (55% of allotments were on opened lands).

[25] *Id.*, at 64–95.  Dr. Hoxie concluded: "Unentered lands were considered a part of the reservation.  They were available for allotment to tribal members, they were leased for the benefit of the tribe, and they were specifically defined as different from land in the public domain."  *Id.*, at 87.

[26] During a debate on subsequent surplus land, Congressman Burke, a sponsor of the Cheyenne River Act, reported: "At the opening of the Cheyenne and the Standing Rock Reservations . . . there were not sufficient people to begin to take anywhere near the land that was to be disposed of, and the reason they did not take it was the price of the land, which was undoubtedly too high."  49 Cong. Rec. 1106 (1913).  According to the Government's estimates, only half of the opened lands ever passed out of Indian ownership.  Brief for United States as *Amicus Curiae* 26–27, n. 31.

## IV

Neither the Act of May 29, 1908, the circumstances surrounding its passage, nor subsequent events clearly establish that the Act diminished the Cheyenne River Sioux Reservation.  The presumption that Congress did not intend to diminish the reservation therefore stands, and the judgment of the Eighth Circuit is

*Affirmed.*