**COLORADO RIVER INDIAN TRIBES, an Indian Tribe, Plaintiff,**

**v.**

**TOWN OF PARKER, a Municipal Corporation, et al., Defendants.**

**No. CIV–83–2359–PHX–R6S.**

United States District Court, D. Arizona.

Jan. 17, 1989.

Russell Barsh, Alletta D'a Belin, Santa Fe, N.M., for plaintiff.

John B. Weldon, Jr., Stephen E. Crofton, Jennings, Strouss & Salmon, Phoenix, Ariz., and Gerald W. Hunt, Hunt, Stanley, Hossler & Moore, Yuma, Ariz., for defendants.

William White, Washington, D.C., James Loss, Phoenix, Ariz., for amicus curiae U.S.

## ORDER

STRAND, District Judge.

## I. INTRODUCTION

In this action, plaintiff Colorado River Indian Tribes ("CRIT" or the "Tribes") challenges the legal authority of the Town of Parker ("Parker") to regulate building activities on lands within the town that are owned by the Tribes and held in trust for them by the United States. Parker asserts that it possesses authority under state law to enforce its building laws on these lands because Parker was disestablished from the CRIT reservation in 1908 by a congressional act. *See* Act of April 30, 1908, ch. 153, 35 Stat. 70, 77 ("Act") (CRIT Ex. 8). This Act, among other things, enabled "the Secretary of the Interior to reserve and set apart lands for townsite purposes in the Yuma Indian Reservation, California and, the Colorado River Indian Reservation in California and Arizona...." *Id.*

## II. TRIBES' MOTION FOR SUMMARY JUDGMENT

Presently before the court is the Tribes' motion for summary judgment, Parker's opposition thereto, plaintiffs' reply, and the United States Government's amicus curiae memorandum. Virtually all of the evidence submitted by the parties consists of undisputed historical documents. In a situation where the facts are not disputed, as here, the case is well suited for summary judgment.

## III. ISSUE PRESENTED

The issue raised in this litigation and now before the court is whether the town of Parker has the authority under state law to enforce its building code laws on lands owned by the Tribes and held in trust for them by the United States.

## IV. ANALYSIS

The CRIT reservation was created by a congressional act of March 3, 1865, and

modified and further defined by executive orders of November 22, 1873, November 16, 1874, May 15, 1876, and November 22, 1915 (CRIT Exs. 1–3). At the turn of the century, Congress passed a series of surplus land acts to force the Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement. *Solem v. Bartlett*, 465 U.S. 463, 466–67, 104 S.Ct. 1161, 1164, 79 L.Ed.2d 443 (1984).[1] It is settled law that some land acts diminished reservations, and other land acts did not. *Id.* 465 U.S. at 469, 104 S.Ct. at 1165. The effect of any given act depends on the language of the act and the circumstances underlying its passage. *Id.* "The first and governing principle" in a courts analysis of this issue is that "only Congress can divest a reservation of its land and diminish its boundaries." *Id.* at 470, 104 S.Ct. at 1166; *Mattz v. Arnett*, 412 U.S. 481, 505 & n. 23, 93 S.Ct. 2245, 2258 & n. 23, 37 L.Ed.2d 92 (1973); *United States v. Grey Bear*, 828 F.2d 1286, 1289 (8th Cir.), *reh. denied*, 836 F.2d 1086 (1987), *reh. granted, vacated in part*, 836 F.2d 1088 (1987) (citations omitted).[2]

There is a strong presumption that reservation lands and boundaries remain in tact. *See Solem*, 465 U.S. at 470, 104 S.Ct. at 1166; *DeCoteau v. District County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975); *Grey Bear*, 828 F.2d at 1289. Before the disestablishment or diminishment of reservation boundaries will be found, a clear congressional intent to do so must be established. *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166; *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977); *Grey Bear*, 828 F.2d at 1289. Further, disestablishment will not be lightly inferred. *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166.

The primary factors a court must consider to determine congressional intent with respect to this issue are: (1) the statutory language of the 1908 Act; (2) the events surrounding its passage; (3) the subsequent treatment of the land after the passage of the Act, including pragmatic factors which would indicate the de facto diminishment of the reservation. *Solem*, 465 U.S. at 470–72, 104 S.Ct. at 1166–67; *Rosebud*, 430 U.S. at 587, 97 S.Ct. at 1363; *Mattz*, 412 U.S. at 505 & n. 25, 93 S.Ct. at 2258 & n. 25; *Grey Bear*, 828 F.2d at 1289. The court will consider each of these factors in turn.

A. Statutory Language

The language of the Act ordinarily is the most probative evidence of congressional intent. *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166. Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation its land. *Id.* When such language is buttressed by an unconditional commitment from Congress to compensate the Indian tribe a sum certain for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished. *Id.* In the present case, the statutory language used in the 1908 Act provides in relevant part as follows:

> there is also appropriated out of any money in the Treasury not otherwise appropriated, the further sum of five thousand dollars, or so much thereof as may be necessary, to enable the Secretary of the Interior to reserve and set apart lands for townsite purposes in the Yuma Indian Reservation, California, and the Colorado River Indian Reservation, in California and Arizona, and to survey, plat, and sell the tracts so set apart in

1. The surplus land acts were the result of a view that Indians should be assimilated into American society and an increasing demand for new lands in the western part of the country. *Solem*, 465 U.S. at 466, 104 S.Ct. at 1164. The surplus land acts anticipated the imminent demise of the Indian reservation system, however, the Supreme Court has determined that it is unwilling "to extrapolate from this expectation

a specific congressional purpose of diminishing reservations with the passage of every surplus land Act." *Id.* at 469, 104 S.Ct. at 1165.

2. The opinion was vacated only with respect to the issue of prejudicial misjoinder under F.R. Crim.P. 8(b). *Grey Bear*, 836 F.2d at 1088.

such manner as he may prescribe, the net proceeds to be deposited in the Treasury of the United States to the credit of the Indians of the reservations, respectively, to be reimbursed out of the funds arising from the sale of the lands.

Act of April 30, 1908, ch. 153, 35 Stat. 70, 77 (CRIT Ex. 8).

Upon its face, the Act does not express an intent to diminish the CRIT Reservation. There is no explicit declaration that the reservation or any part thereof was terminated or ceded. Indeed, the provisions of the instant Act stand in sharp contrast to the explicit language of cession employed in the Lake Traverse and 1904 Rosebud Acts discussed in the Supreme Court's *De-Coteau* and *Rosebud Sioux Tribe* opinions. *Solem*, 465 U.S. at 469 n. 10, 473, 104 S.Ct. at 1165 n. 10, 1167. The Act, rather than reciting an Indian agreement to "cede, sell, relinquish and convey" the opened lands, simply authorizes the Secretary to reserve and set apart lands on two Indian reservations unspecified as to size and location for townsite purposes, to sell the tracts, and to create Indian accounts for the proceeds.[3]

Furthermore, there is no unconditional commitment to compensate the Indians a sum certain for their opened lands. *Solem*, 465 U.S. at 470–71, 104 S.Ct. at 1166; *De-Coteau*, 420 U.S. at 441, 95 S.Ct. at 1091; *Grey Bear*, 828 F.2d at 1290; *Ute Indian Tribe v. State of Utah*, 773 F.2d 1087, 1092 (10th Cir.1985), *cert. denied*, 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). Where, as here, the compensation for the land unspecified in size and location is not set at any fixed price and the Tribes are guaranteed reimbursement only for the lands actually disposed of by the government, no unconditional commitment by Congress to pay the tribes a sum certain

exists. *See Solem*, 465 U.S. at 473, 104 S.Ct. at 1167; *Grey Bear*, 828 F.2d at 1290.

While the court has not found a disestablishment case which interprets language identical to the instant Act's language, courts interpreting similar acts which also include a townsite provision have not found disestablishment from the reservations. *See Confederated Salish & Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir.) *cert. denied*, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982)[4]; *United States ex rel. Condon v. Erickson*, 478 F.2d 684, 689 (8th Cir.1973). Additionally, the Supreme Court when faced with interpreting similar language, albeit not language creating a township, has concluded that such language "did no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the federal government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of wards." *Solem*, 465 U.S. at 473, 104 S.Ct. 1167 (quoting *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 356, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962)).

Based upon the court's interpretation of the statutory language of the Act, the court concludes that there was no clear expression of congressional intent to disestablish the town of Parker from the reservation.

**B. Events Surrounding the Passage of the Act**

Explicit language of cession and unconditional compensation are not the only method in determining a finding of diminishment of an Indian reservation, as a court may examine the events surrounding the passage of a surplus lands act. *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166 (citing *Rose-*

---

**3.** The 1908 Act is a unilateral statute enacted by Congress similar to the statute in *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909) which the Supreme Court held had not terminated reservation status. The statute did not expressly vacate the reservation and restore the land to the public domain as required by the Supreme Court in *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). In addition, the statute was not the

ratification of a bilateral agreement between the Indians and the United States as in *Rosebud Sioux Tribe*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660.

**4.** *See also Confederated Salish & Kootenai Tribes v. Namen*, 380 F.Supp. 452, 464 (D.Mont.1974); *Security State Bank v. Pierre*, 162 Mont. 298, 511 P.2d 325, 329 (1973).

*bud Sioux Tribe*, 430 U.S. 584, 97 S.Ct. 1361). In the instant case, there is little in the way of legislative history by which congressional intent may be interpreted. Unlike *Rosebud Sioux Tribe* or *DeCoteau*, there were no comments on negotiations or agreements with the Indian tribes to set aside or cede the Parker townsite nor language indicating an intent to disestablish Parker from the reservation. In addition, even when surrounding legislative history has referred to reservations as "reduced" or "diminished" that has been held to be, without more, inconclusive of congressional intent. *Solem*, 465 U.S. at 478, 104 S.Ct. at 1170.

When events surrounding the passage of a surplus land act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress— unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, it may be inferred that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest that the reservation boundaries remained unchanged. *Solem*, 465 U.S. at 471, 104 S.Ct. at 1166.

Based upon the materials submitted and reviewed by the court, the circumstances surrounding the passage of the 1908 Act fail to establish a clear congressional purpose to disestablish the Parker townsite from the CRIT Reservation. As stated, there were no negotiations, agreements or treaties with the Tribes concerning a cession of their lands to the federal government. The 1908 Act, in contrast to the Lake Traverse Act and 1904 Rosebud Act, did not begin with an agreement between the United States and the Indian tribes, in which the Indians agreed to cede a portion of their territory to the federal government. *See Solem*, 465 U.S. at 476, 104 S.Ct. at 1169.

The few surrounding circumstances that are available for study and analysis fail to disclose a clear congressional intent to diminish the CRIT reservation. Neither the earlier acts, including the 1904 Act,[5] nor the origins of the bill are helpful to Parker's position that the 1908 Act disestablished the town of Parker from the CRIT reservation. The proposed draft of the bill introduced by the Secretary of the Interior James R. Garfield in November, 1907 concerned itself with allotment of the lands, sale of lands for townsite purposes, and reserving lands for school and administrative purposes. *See* House Document 43, 60th Cong., 1st Sess. (1908); Senate Report 278, 60th Cong., 1st Sess. (1908) (Lawrence C. Kelly, Parker Arizona, An Analysis of Its Origin, Its Relation to the Colorado Indian Reservation, and Its History, Ex. 12 (December, 1987) ("Kelly Report")). This draft legislation and the accompanying descriptive letter to the Speaker of the House of Representatives is not helpful to Parker's position as many of the proposals were left out of the eventual Act and the suggestion for a townsite is not discussed in detail. *See* Kelly Report, at 14.

Similarly, the administrative correspondence, primarily the letters of Superintendent Atkinson written to the Commissioner of Indian Affairs between November, 1903 and December 1907, which often mentioned the creation of a townsite on the reservation; a hope to keep the townsite dry; the impact of the railroad on the land; the need for a new school and irrigation facilities; and the benefits a townsite would create for the Indians, do not assist in the effort to determine congressional intent (Parker Exs. 5–9). Furthermore, the Department of the Interior's October, 1907 letter to the Superintendent providing, in part, that in the absence of information demonstrating that "it would be to the advantage of the Indians to establish a townsite at this time, the Office does not believe that such legislation should be urged" does not help divine a clear congressional intent, but does

---

5. This act dealt with the reclamation and irrigation of allotted lands on the reservation and the opening of the remainder of the reservation to non-Indian settlers. Act of April 21, 1904, 33 Stat. 224, sec. 25 (1904) (CRIT Ex. 4).

demonstrate a concern for the welfare of the Indians (Parker Ex. 9).[6]

The events surrounding the passage of the 1908 Act fail to establish that Congress understood itself to be relinquishing all interest in the lands. In the absence of some clear statement of congressional intent or a contemporaneous understanding that the CRIT reservation would be diminished by the Act, the strong presumption favoring retention of reservation status cannot be overcome. *Solem*, 465 U.S. at 472, 104 S.Ct. at 1167; *Grey Bear*, 828 F.2d at 1290–91.

### C. Subsequent Treatment of the Land

Events that occurred after the passage of a surplus land act have been looked at to decipher congressional intent. *Id.* 465 U.S. at 471, 104 S.Ct. at 1166. However, these subsequent events have secondary importance.[7] Congress' own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs ("BIA") and local judicial authorities dealt with unallotted open lands. *Id.* The court has also recognized that pragmatic factors may be relevant in interpreting a surplus land act. *Id.*

The question of the legal status of the town of Parker was hotly debated in the years following its creation in 1908. The subsequent treatment of the CRIT reservation by Congress, the Executive branch, and the courts is inconsistent and shows disagreement and confusion on the issue rather than a widely held understanding or treatment of Parker as being disestab-lished from the CRIT reservation. For example, examination of the Department of the Interior documents indicates disagreement between the Indian Office and the General Land Office ("GLA") as to whether Parker was Indian country. The Indian Office consistently maintained the position that Parker was Indian country on issues concerning liquor distribution, while, the GLA took a contrary position on issues relating to residence permits and traders licenses. Additionally, the opinions of the Solicitor of the Department of the Interior have been inconsistent over the years, but the majority of these opinions favor the Tribes' position that Parker remained within the boundaries of the CRIT reservation. *See* CRIT Exs. 25, 26, 28.

The February 10, 1911 Order of the First Assistant Secretary of the Interior sets aside land for school and agency purposes. CRIT Ex. 42 (Deposition of Lawrence Kelly, Ex. 6). The 1911 Order modified the June 10, 1908 Order that set aside the land for Parker. The 1908 Act and the 1911 Order accomplished the dual purposes of setting aside land for the town of Parker, while also setting aside land in Parker for a school and administrative purposes that were contained in Secretary Garfield's proposed bill. The 1911 Order setting aside land for a school in Parker tends to indicate that the townsite was intended to remain as a part of the Indian reservation and was not disestablished from the reservation by the 1908 Act. *See Solem*, 465 U.S. at 474, 104 S.Ct. at 1168.

Subsequent congressional legislation and reports such as the Act of 1939,[8] *see* Act of

---

**6.** The fact that there was a demonstrated concern about the welfare of the Tribes, the discussions about reserving land for Indian schools and keeping the townsite dry indicate that the townsite would remain an important part of the Indian reservation. This suggests that the areas opened up to non-Indian settlers would remain part of the reservation. *See Solem*, 465 U.S. at 474, 104 S.Ct. at 1168. Although the school provision was deleted from the 1908 Act, the Secretary of Interior issued an Order of February 10, 1911, modifying the 1908 Act that set aside land for the creation of Parker, which sets aside certain lots in Parker for school and administrative purposes. CRIT Ex. 42, at 171–73 (Deposition of Lawrence Kelly, Ex. 6).

**7.** "Although subsequent legislation usually is not entitled to much weight in construing earlier statutes, it is not always without significance." *Mattz*, 412 U.S. at 505 n. 25, 93 S.Ct. at 2258 n. 25 (citations omitted).

**8.** In this act, Congress authorized the sale by auction of the unsold town lots within Parker but only with the consent of the Tribes' Tribal Council. It should be noted that the Supreme Court has refused to equate reservation status with Indian title, and that, therefore, the fact that title to the area in question passed to non-Indian purchasers is not determinative of the status of the land. *See Celestine*, 215 U.S. 278, 30 S.Ct. 93.

August 5, 1939, ch. 431, 53 Stat. 1203, and the Senate Report on the bill (CRIT Ex. 15); S.Rep 809, 76th Cong., 1st Sess. July, 1939 (CRIT Ex. 16), favors the Tribes' position as they reflect a congressional understanding that unsold lots in Parker were part of the reservation and that Parker was located within the CRIT Reservation. Similarly, the Secretary of the Interior's March 8, 1937 Order reflects the belief that Parker lands have always been considered part of the reservation and do not demonstrate an intent to diminish (CRIT Ex. 12).

Parker has produced numerous post–1908 correspondence indicating a belief in some quarters that Parker was a "town off the reservation" or "not in Indian country." See Parker's Opposition, at 24–57; Parker's Controverting Statement of Facts, Ex. 1 (Kelly Report). Parker contends that a Department of Interior decision which placed Parker under the heading of "Ceded Indian Reservations" evidences subsequent treatment of Parker as being disestablished. See 38 Int. Dec. 97, 140–09 (1909) (Kelly Report Ex. 59). However, isolated phrases and references to diminishment "are hardly dispositive," Solem, 465 U.S. at 475, 104 S.Ct. at 1168, in light of the contrary historical evidence concluding that Parker is within Indian territory, nor are the isolated phrases sufficient to overcome the strong presumption that reservation status was left intact.

Undoubtedly, the unfamiliarity with "[t]he notion that reservation status of Indian lands might not be coextensive with tribal ownership" fueled the confusion over whether Parker remained Indian country. See id. at 468, 104 S.Ct. at 1164. Prior to 1948, Indian lands were defined to include only lands in which an Indian held a recognized property interest. Id., at 468, 104 S.Ct. at 1165 (citing Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920); Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471 (1877)). Therefore, fee land owned by a non-Indian would not be "Indian country." The fact the land was not "Indian country," fails to determine the issue of whether the land remained part of the reservation.

In 1948, Congress "uncoupled reservation status from Indian ownership" and resolved any ambiguities concerning what type of lands were "Indian country." See Solem, 465 U.S. at 469, 104 S.Ct. at 1165. Congress statutorily defined "Indian country" to include lands held in fee by non-Indians within the boundaries of Indian reservation. Act of June 25, 1948, ch. 645, 62 Stat. 757 (codified at 18 U.S.C. sec. 1151).

After the Supreme Court's 1962 decision in Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) law enforcement officials from the federal government, the Tribes, Parker, state, and county, acknowledged that Parker was considered "Indian country" under Seymour, and agreed that Indians accused of crimes in Parker were subject to tribal and federal law, not state law. CRIT Ex. 61 (Minutes of December 17, 1963 Meeting concerning Jurisdiction of Law and Order Officials on Colorado River Reservation and the Town of Parker).

In 1964, Congress confirmed the understanding that Parker had always been part of the CRIT reservation. Pub.L. No. 88–302, sec. 2, 78 Stat. 188 (April 30, 1964). Section 2(b) of the 1964 act defines the CRIT reservation:

"Colorado River Reservation" means the reservation for Indian use established by the Act of March 3, 1965 (13 Stat. 559), as modified and further defined by Executive orders of November 22, 1873, November 16, 1874, May 15, 1876, and November 22, 1915, all of which area shall be deemed to constitute said reservation.

Id. (emphasis added) (CRIT Ex. 21). The 1964 act clearly did not exempt Parker from the definition of the CRIT reservation. Id.

In January 1978, the Congressional Research Service issued a report to the Senate Judicial Machinery Subcommittee, which was headed by Senator DeConcini of Arizona, entitled "Parker, Arizona—Indian Country or State Land?" CRIT Ex. 23. The report concluded that Parker was Indian country and is part of the Colorado River Reservation. Id. In April 1978, Sen-

ator DeConcini of Arizona introduced a bill to the Senate (S. 2854) for the purpose of granting the State of Arizona criminal and civil jurisdiction within Parker (CRIT Ex. 24). Senator DeConcini noted that: "None of the enabling legislation establishing Parker expressed an intention that the lands sold be withdrawn from the reservation, nor did the State of Arizona assume jurisdiction over Indian reservations within its boundaries pursuant to Public Law 280." *Id.* Senator DeConcini recognized that Parker remained subject to a complicated patchwork of state, federal, and tribal jurisdiction. *Id.* A purpose of this bill was to clear up the jurisdictional and procedural confusion. S. 2854 was introduced as an amendment to 18 U.S.C. sec. 1162(a) and 28 U.S.C. sec. 1360(a), which would have added Parker to the list of areas in Indian country wherein states are conferred civil and criminal jurisdiction. *Id.* Although S. 2854 failed to pass it, along with the 1978 Report, further indicates that Congress never diminished the CRIT reservation.

On a pragmatic level, the court may consider who has actually moved upon the land in determining what Congress intended. *Solem,* 465 U.S. at 471–72, 104 S.Ct. at 1166–67. "Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred." *Id.* at 471, 104 S.Ct. at 1166. There are limits, however, in how far a court can go to decipher Congress' intent with regard to the 1908 Act. *Id.* at 472, 104 S.Ct. at 1167. Where, as in this case, the Act and its legislative history, the events surrounding the Act's passage, and subsequent events "fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," this court is bound by the "traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived...." *Id.* at 472, 104 S.Ct. at 1167. Evidence of subsequent events, including de facto considerations, can be used to cor-

roborate more probative evidence of disestablishment. *See id.* at 471, 104 S.Ct. at 1166; *Rosebud Sioux Tribe,* 430 U.S. at 588 n. 3, 604–05, 97 S.Ct. at 1364 n. 3, 1372–73; *DeCoteau,* 420 U.S. at 428, 95 S.Ct. at 1085. Evidence of subsequent events, including de facto considerations, has never, by itself, met the strict disestablishment standard under *Solem.* This court does not interpret *Solem* as establishing a de facto diminishment analysis that can form an independent basis for determining that an Indian reservation has been diminished. At most, evidence of de facto diminishment is "one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers." *See id.* 465 U.S. at 473, 104 S.Ct. at 1167.

Nevertheless, a review of the de facto considerations fails to show that the lands at issue in this lawsuit—the tribally owned lands held in trust for the Tribes by the United States—have been de facto diminished.

With respect to the demographic trends, the court notes that: (1) the Tribes own approximately one-third of the lands within Parker. *Affidavit of R. Moore;* (2) the Indian population in Parker has increased from zero to 293 between 1910 and 1980, while during the same time frame, the non-Indian population in Parker has increased from 90 to 2,249; and (3) as of the 1980 census, 7,873 persons lived on the reservation as a whole of whom 1,965 are Indians.[9] *Plaintiff's Motion for Summary Judgment,* at 23–24; *Parker's Opposition,* at 55–56; *Plaintiff's Reply,* at 39. These figures reflect a numerical and percentage increase of Indians in Parker since 1908, as well as, an insignificant variation in the Indian versus non-Indian character of Parker as compared to the remainder of the reservation. Furthermore, there are considerably more than "a few surviving pockets of Indian allotments" found in Parker and the number of non-Indians that live on the reservation hardly show a "flooding" of non-Indians into Parker. *See Solem,* 465

9. Parkers is included as part of the reservation for U.S. Census purposes.

U.S. at 472 & n. 12, 104 S.Ct. at 1167 & n. 12.

The court notes that Parker provides governmental services within the townsite such as; electricity, water, refuse collection, telephone service, and natural gas service, to all of the lots in Parker, including the tribally owned lots. Parker also attempts to enforce its building and zoning ordinances on all the lots in Parker, including the tribally owned lots. The court also recognizes Parker's arguments that: (1) many non-Indians in Parker sincerely believe that Parker is not part of the CRIT reservation; (2) in the past, the Tribes often did not object to local law enforcement in Parker; (3) in the past, the Tribes have asked for zoning variances from Parker; (4) prior to 1978, no tribal offices were located within Parker; (5) the Tribes submitted a bid to provide refuse collection in Parker and accepted Parker's decision to hire another company.

It is undisputed that the Tribes have steadily increased their presence in numbers, lots owned, influence, and role in the law enforcement activities in Parker. The Tribes have established a tribal building code on tribal lots within Parker. *Affidavit of Steve Lamb.* Establishment of a tribal building code evidences that the Tribes have not acquiesced in allowing non-Indians to control the aesthetic character and quality of buildings in Parker. The Tribes require a payment of fees for a building permit, for review of building plans, and for inspection of the electrical, mechanical, and plumbing systems before the they give final approval to a new building. The tribal property is not subject to taxation or to assessments for sewage or other utility charges. *See* CRIT Ex. 22 (Letter from the Deputy Commissioner of Indian Affairs to Congressman Udall, dated December 16, 1964). Furthermore, members of the Tribes that live in Parker are not subject to state income, property, privilege, or sales taxes. *See* CRIT Ex. 26 (Letter from Field Solicitor to Area Director, Phoenix Area Office, dated February 19, 1975), & Ex. 31 (Letter from the Chief Counsel Tax Division, Arizona Attorney General's Office, to Steven Bloxham, dated June 2, 1983).

A review of the events subsequent to the 1908 Act fail to show that Congress intended to diminish the CRIT reservation or that the tribally owned lots at issue have "long since lost its Indian character." *See Solem,* 465 U.S. at 471, 104 S.Ct. at 1166. In fact, subsequent events tend to confirm that the tribally owned lots within the town of Parker remain part of the CRIT reservation. A consideration of the pragmatic factors with respect to the tribally owned lots also fails to support a finding that the tribally owned lots were disestablished from the CRIT reservation.

## V. Conclusion

The court concludes that the face of the 1908 Act, the legislative history, and the surrounding events do not demonstrate the necessary congressional intent to diminish the CRIT reservation. Subsequent events and pragmatic factors fail to show that the tribally owned lots were disestablished. Instead, the tribally owned lots remain what they have always been, a part of the Colorado River Indian Reservation. Since the tribally owned lots are part of the Colorado River Indian Reservation, Parker does not have the authority to impose or enforce any building or zoning ordinances with respect to this tribal property.

Based upon the foregoing,

IT IS ORDERED granting the Colorado River Indian Tribes' motion for summary judgment to the effect that the tribally owned lots in the Town of Parker now are, and always have been part of the Colorado River Indian Reservation and that, said lots, are Indian country, as that term is defined by federal law.

FURTHER ORDERED that the Town of Parker is hereby permanently enjoined from attempting to impose or enforce the provisions of Chapter Seven of the Parker Town Code, or any other laws, ordinance, rules, regulations or other requirements which seek or purport to regulate, license, or otherwise interfere with building activities occurring on the tribally owned lands

held in trust by the United States within the Town of Parker.

FURTHER ORDERED that the Town of Parker is hereby permanently enjoined from preventing the provision of electrical and water utility service, or any other utility service over which the Town of Parker exercises direct or indirect control, to the tribally owned lands held in trust by the United States within the Town of Parker, to the extent that such deprivation of services is dependent solely upon compliance with Chapter Seven of the Parker Town Code or any other such law, ordinances, rules, regulations or other requirements of the Town of Parker which seek or purport to regulate, license or otherwise interfere with building activities occurring upon the tribally owned lands held in trust by the United States within the Town of Parker.