UNITED STATES of America,
Plaintiff–Appellee,

v.

Christopher Lee WEBB, Defendant–Appellant.

No. 99–30155.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 2000.

Filed July 28, 2000.

Terry L. Derden, Assistant United States Attorney, Boise, Idaho, for the plaintiff-appellee.

Gerald Smith, Assistant Federal Public Defender, Spokane, Washington, for the defendant-appellant.

Before: BROWNING, FLETCHER, and GOULD, Circuit Judges.

FLETCHER, Circuit Judge:

The United States indicted Christopher Lee Webb, a Native American, on two counts of sexual contact with a minor in violation of 18 U.S.C. § 2244, for conduct occurring on allotted land within the boundaries of the Nez Perce Reservation in Idaho. The government asserted federal jurisdiction under 18 U.S.C. § 1153(a), which covers certain offenses committed by Indians within "Indian country." Webb moved to dismiss the indictment for lack of jurisdiction on the theory that the alleged acts were not committed within "Indian country," as that term is defined at 18 U.S.C. § 1151. The district court denied the motion, Webb entered a conditional plea, was sentenced, and this appeal followed. We are asked to decide whether the Nez Perce Reservation, established by treaty in 1863, was diminished or disestablished by virtue of the allotment of land to tribal members and the sale of surplus lands to the United States for settlement by whites pursuant to the General Allotment Act of 1887, 24 Stat. 388 (the "Dawes Act").

## I. Facts And Procedural History

The indictment states, and Webb concedes, that the alleged offenses occurred at 216 East Alder Avenue in Lapwai, on land within the boundaries of the Nez Perce Indian Reservation as established by the 1863 Treaty with the Nez Perces, 14 Stat. 647. The parties agree that the land passed into fee simple ownership in 1908.

Webb filed a motion to dismiss the indictment for lack of jurisdiction, arguing that the 1863 reservation boundaries were diminished by the subsequent allotment and cession of lands according to an agreement between the Nez Perce and the United States, ratified by Congress in 1894. Specifically, Webb argued that the property on which the alleged acts took place is allotted land, the title to which has long since passed into fee simple ownership. According to Webb, both lands ceded to the United States for sale and settlement by whites, as well as land allotted to Indians which has passed into fee simple ownership, are no longer part of the Nez Perce Reservation and thus no longer within "Indian country" for purposes of federal jurisdiction.

Following an evidentiary hearing at which the parties presented extensive evidence regarding Congress's intent in ratifying the agreement of cession, as well as the subsequent treatment of the reservation's boundaries, the district court denied the motion to dismiss. In a carefully reasoned opinion, the district court found that the reservation was not diminished by the allotment and cession of lands within the 1863 boundaries because there was no evidence that either the Nez Perce or the United States intended a diminishment. *United States v. Webb,* No. CR–98–80–N–EJL, Memorandum Decision and Order Denying Motion to Dismiss (D.Idaho Jan. 12, 1999) ("Order Denying MTD"). Webb then entered a guilty plea, reserving the right to appeal the ruling on the motion to dismiss. After sentencing, Webb filed the instant appeal.

## II. Standard Of Review

A district court's assumption of jurisdiction is reviewed de novo. *United States v. Bennett,* 147 F.3d 912, 913 (9th Cir.1998) (citing *United States v. Juvenile Male,* 118 F.3d 1344, 1346 (9th Cir.1997); *United States v. Vasquez–Velasco,* 15 F.3d 833, 838–39 (9th Cir.1994)). Where questions of jurisdiction hinge on factual determinations, the district court's findings of fact are reviewed for clear error. *H2O Houseboat Vacations Inc. v. Hernandez,* 103 F.3d 914, 916 (9th Cir.1996) (citing *Wilson v. A.H. Belo Corp.,* 87 F.3d 393, 396 (9th Cir.1996)).

## III. Discussion

According to 18 U.S.C. § 1151, "Indian country" means:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

As the parties concede, this case involves only subsection (a) and the question whether the allotted land at issue still lies within the Nez Perce Reservation.

### A. Establishment and Allotment of the Nez Perce Reservation

Prior to colonization of the Pacific Northwest by whites, the Nez Perce occupied a territory consisting of over 13 million acres in what is now central Idaho, southeastern Washington and northeastern Oregon. In the Treaty of 1855, a 7.5 million acre reservation was established:

> for the use and occupation of the said tribe ... [all of] which tract shall be set

apart, and, so far as necessary, surveyed and marked out for the exclusive use and benefit of said tribe as an Indian reservation; nor shall any white man, excepting those in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent; and the said tribe agrees to remove to and settle upon the same within one year after the ratification of this treaty.

Treaty with the Nez Perces, 1855, 12 Stat. 957. The United States agreed to pay $200,000 for the lands ceded under the Treaty.

As westward expansion and the encroachment of white settlers increased, negotiations for a reduction in the size of the reservation began. The result was the Treaty of 1863, according to which the Nez Perce ceded over six million acres and agreed to a new reservation comprising some 750,000 acres. Dissatisfaction with certain aspects of the 1863 Treaty among tribal members (particularly those dislocated from their homelands and forcibly removed to the new, smaller reservation by the federal government) led to the Nez Perce War of 1877.

After the passage of the Dawes Act, a federal agent was sent by the Commissioner of Indian Affairs to allot lands in the reservation to individual Indians. The allotments consisted of approximately 180,000 acres spread throughout the reservation. Once the allotments were chosen,

President Benjamin Harrison established a three-person "Commission" authorized to negotiate for the cession and sale of surplus lands to the United States for purchase and settlement by whites.

In the first round of negotiations, the Nez Perce Counselors confirmed that sale of unallotted land was the *only* objective of the negotiation [1] and then informed the Commission that the tribe favored its existing treaties and did not wish to sell any land. The Counselors also voiced complaints regarding white trespassers and problems with the allotment of the reservation.[2] In order to address the tribe's concerns, the Commissioners added clauses to the model agreement they brought to the negotiation. Most prominently, the Commissioners added a savings clause designed to preserve all of the tribe's treaty rights not inconsistent with the sale of the surplus lands. The clause provides that "[t]he existing provisions of all former treaties with said Nez Perce Indians not inconsistent with the provisions of this agreement are hereby continued in full force and effect." Article XI, 1893 Agreement with the Nez Perce Indians, 28 Stat. 327, 331.[3]

When the Counselors still refused to sell, the Commissioners adopted a different strategy, holding smaller meetings and traveling around the reservation to gather signatures from male members of the tribe outside the council format. Within six months, a majority of the men had signed the agreement and the Commission report-

---

1. When one of the Counselors asked "Is the sale of unallotted lands the only object?" Commissioner James Allen responded, "Yes; the land you do not require after your allotments are made and what timber and wood land you need. The commission has your interest at heart...." Sen. Exec. Doc. No. 31, p. 27, 53d Cong.2d Sess. ("Council Minutes"). When another Counselor asked "Is the land which is not allotted the one you came for?" Commissioner Schleicher flatly responded, "Yes." *Id.*

2. Among other things, the federal agent in charge of allotment had apparently erred to the detriment of the tribe in determining the north boundary of the reservation.

3. As Commissioner Allen assured the tribe:

 The effect of this agreement would not be to alter or to change any of the provisions of former treaties, except as they are modified by the new agreement. All other provisions will stand as they now are, and we will add a clause to that effect in this agreement that is being made. I believe it as well to state in this agreement that we are now trying to obtain your signatures to, shall not alter or change any provision of existing treaties except insofar as directly changed by this treaty.

 Council Minutes at 53.

ed to the Secretary of the Interior. According to the agreement, 32,020 acres in timber land scattered throughout the reservation was reserved in common for the tribe, and the remainder (excluding allotted lands) was sold to the United States for $1,626,222.[4] Congress ratified the 1893 Agreement the following year in the Indians Appropriations Act of 1894, 28 Stat. 332, along with several other allotment/cession agreements.

According to the Dawes Act, allotted lands were to be held in trust by the United States for 25 years, at which time the land would pass in fee simple to the individual allottee who would then become a citizen of the United States and subject to the laws of the state in which he or she resided. *See* 24 Stat. 389 §§ 5, 6. On November 8, 1895, after all the trust patents were issued to the Nez Perce for allotted lands, President Grover Cleveland issued a proclamation opening the unallotted lands to settlement "subject to all the conditions, limitations, reservations and restrictions in [the 1863 Agreement] . . . and the laws of the United States applicable thereto." Proclamation of Nov. 8, 1895, 29 Stat. 873.

 Webb's principal contention in the district court below and on appeal is that the 1893 Agreement either disestablished the entire 1863 reservation or at least diminished its boundaries to the lands held in common and those allotments still under Indian ownership. In either case, the allotted land on which the alleged offense occurred would be outside the reservation boundary, and therefore outside of Indian country under 18 U.S.C. § 1151(a). *See* William C. Canby, Jr., American Indian Law 120 (3d ed. 1998) ("When a reservation is diminished or disestablished, the area excluded from the reservation is no longer Indian country under subsection (a) of 18 U.S.C.A. § 1151,

which refers to 'all land within the limits of any Indian reservation.'"). On the other hand, if the property is within boundaries of the reservation, it is Indian country irrespective of whether title is now held by a non-Indian. *See* 18 U.S.C. § 1151(a) (covering all land "within the limits of any Indian reservation . . . *notwithstanding the issuance of any patent*") (emphasis added).

### B. Rules of Construction

 According to well established Supreme Court precedent, Webb has a heavy burden. As the Court observed in *Solem v. Bartlett:*

> Our precedents in the area have established a fairly clean analytical structure for distinguishing those surplus land acts that diminished reservations from those acts that simply offered non-Indians the opportunity to purchase land within established reservation boundaries. The first and governing principle is that only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise. *See United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909). Diminishment, moreover, will not be lightly inferred. Our analysis of surplus land acts requires that Congress clearly evince an "intent to change boundaries" before diminishment will be found. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 615, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (footnote omitted). *See also Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 343–44 (9th Cir.1996) ("Once a reser-

---

**4.** Article I of the 1893 Agreement provided in part:

The said Nez Perce Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and inter-

est in and to all the unallotted lands within the limits of said reservation, saving and excepting the following tracts of land, which are hereby retained by the said Indians. . . .

vation is established, there is a strong presumption that it remains intact"; requiring " 'substantial and compelling evidence' of an intent on the part of the government to diminish") (citing *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); quoting *Solem,* 465 U.S. at 472, 104 S.Ct. 1161).

■ The Supreme Court has developed a three-tiered test to assess congressional intent. First "[t]he most probative evidence of congressional intent is the statutory language used to open the Indian lands." *Solem,* 465 U.S. at 470, 104 S.Ct. 1161. Thus in the context of lands sold back to the government, the Court has regularly held that language of cession, combined with a commitment to pay a sum certain, creates "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Id.* at 470–71, 104 S.Ct. 1161 (citing *DeCoteau,* 420 U.S. at 447–48, 95 S.Ct. 1082). Second, the Court looks to legislative history and the surrounding circumstances of a surplus land act in order to determine the "contemporaneous understanding" of the act's purpose and effect. *Id.* at 471, 95 S.Ct. 1082. Finally, although far less probative, events after the passage of a surplus land act may be examined "to decipher Congress's intentions." *Id.* at 471–72, 95 S.Ct. 1082 (looking to Congress's treatment of the affected areas, the manner of treatment by Bureau of Indian Affairs and local judicial authorities, as well as who settled in the area and subsequent demographic history). As the *Solem* Court stressed, however:

> [t]here are, of course, limits to how far we will go to decipher Congress's intention in any particular surplus land act. When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.

*Id.* at 472, 104 S.Ct. 1161 (citing *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent of Wash. State Penitentiary,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)).

■ The "traditional solicitude for Indian tribes" incorporates two basic propositions of federal Indian law: first, "[i]t must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government," *McClanahan v. State Tax Comm'n,* 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (noting that "Indian sovereignty doctrine is relevant ... because it provides a backdrop against which the applicable treaties and federal statutes must be read"); and second, in agreements with Indian tribes, the "general rule" is that ambiguities or " '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " *Id.* at 174, 93 S.Ct. 1257 (quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930)); *see also Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 766, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985) ("doubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe") (citations omitted); *Rosebud Sioux,* 430 U.S. at 586, 97 S.Ct. 1361 ("In determining [congressional] intent, we are cautioned to follow the general rule that [d]oubtful expressions are to be resolved in favor of [the tribe].") (internal quotation marks and citations omitted); *Celestine,* 215 U.S. at 291, 30 S.Ct. 93 ("the legislation of Congress is to be construed in the interest of the Indian"); *Parravano v. Babbitt,* 70 F.3d 539, 544 (9th Cir.1995) ("In interpreting statutes that terminate or alter Indian reservations, we construe ambiguities in favor of the Indians. Rights arising from these statutes must be interpreted liberally, in favor of the Indians.") (citations omitted).

## C. The Yankton Sioux Case

Webb relies almost exclusively on *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998), in which the Supreme Court interpreted sum certain, cession language as diminishing the Yankton Sioux reservation by the amount of unallotted, surplus lands ceded back to the United States. The tribe unsuccessfully claimed that a proposed waste site on ceded land was still in Indian country and therefore subject to federal environmental regulations. According to Webb, substantially identical sum certain, cession language is used in the 1893 Agreement with the Nez Perce and the court is therefore obliged to find diminishment.

The fatal flaw in this line of reasoning is that the *Yankton Sioux* Court held only that the reservation was diminished by unallotted lands ceded to the United States.[5] The Court explicitly declined to reach the question whether the terms and surrounding circumstances of the agreement manifested an intent to sever allotted lands:

> The conflicting understandings about the status of the reservation, together with the fact that the Tribe continues to own land in common, caution us, however, to limit our holding to the narrow question presented: whether unallotted, ceded lands were severed from the res-

ervation. We need not determine whether Congress disestablished the reservation altogether in order to resolve this case and accordingly decline to do so. . . .

In sum, we hold that Congress diminished the Yankton Sioux Reservation in the 1894 Act, that the unallotted tracts no longer constitute Indian country, and thus that the State has primary jurisdiction over the waste site and other lands ceded under the Act.

522 U.S. at 358, 118 S.Ct. 354.

Webb's alleged conduct, by contrast, took place on allotted lands. Absent evidence that the tribe and Congress contemplated and intended reservation status to end,[6] or unequivocal language of termination,[7] the Supreme Court has never held that allotted lands were severed from a reservation by an agreement for the cession and sale of surplus lands made pursuant to the Dawes Act. Thus whatever the status of unallotted, surplus lands ceded by the Nez Perce under the 1893 Agreement, and whatever the strength of the presumption of diminishment created by the sum certain, cession language concerning the surplus lands, *Yankton Sioux*, and the sum certain, cession cases on which it rests, provide no support for the claim that the 1863 reservation was diminished by the allotment of lands in severalty to the Nez Perce.[8] Both Webb and the district court fail to make this critical distinction between unallotted, surplus lands ceded back

5. This is not the only difficulty with Webb's position. The Supreme Court has recently reaffirmed the rule that it is improper to assume that "similar language in two treaties between different parties has precisely the same meaning." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (individualized "review of the history and the negotiations of the agreement is central to the interpretation of treaties") (citation omitted).

6. *See DeCoteau*, 420 U.S. at 446, 95 S.Ct. 1082 (entire reservation terminated where record of negotiations established tribe's desire to end reservation, agreement ceded all unallotted land and reserved no portion for tribal use, and "sponsors of legislation stated repeatedly that the ratified agreements would

return the ceded lands to the 'public domain'"; "historical circumstances make clear [that] the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs").

7. *See Mattz*, 412 U.S. at 505 n. 22, 93 S.Ct. 2245 (noting that "Congress has used clear language of express termination when that result is desired," and quoting instances where acts declared a reservation "abolished," "discontinued," or "vacated and restored to the public domain").

8. The diminishment cases involving unallotted, surplus lands fall into two general categories. In the first category, where the Court

to the government, and lands allotted in severalty to the Nez Perce.[9]

## D. Reservation Status

In order to prevail, then, Webb must show that by ratifying the 1893 Agreement, Congress specifically intended either to terminate the entire reservation, or to diminish it not just by the surplus lands sold to the United States for purchase and settlement by whites, but by the lands allotted to the Nez Perce. More-

has found diminishment by virtue of the transfer of unallotted lands back to the government, the acts or agreements at issue contained sum certain, cession language, or language providing that the lands are "restored to the public domain," and surrounding circumstances confirmed an intent to diminish. *See Yankton Sioux,* 522 U.S. at 345, 351–54, 118 S.Ct. 789 ("a negotiated agreement providing for the total surrender of tribal claims in exchange for a fixed payment [ ] bears the hallmarks of congressional intent to diminish a reservation"; detailing supporting evidence from the contemporary historical context); *Hagen v. Utah,* 510 U.S. 399, 414, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) ("[R]estoration of unallotted reservation lands to the public domain evidences a congressional intent with respect to those lands inconsistent with continued reservation status. Thus, the existence of such language in the operative section of a surplus land Act indicates that the Act diminished the reservation."); *see id.* at 416–20, 114 S.Ct. 958 (detailing supporting contemporary historical evidence); *Seymour,* 368 U.S. at 354, 82 S.Ct. 424 (recognizing diminishment where part of reservation was "vacated and restored to the public domain"). *Rosebud Sioux* is a somewhat anomalous member of this category because, although the Court relied almost entirely on evidence of the surrounding circumstances to divine congressional intent, the most persuasive evidence relied upon was sum certain, cession language in a prior version of the surplus land acts that actually passed into law. *See* 430 U.S. at 587–88, 97 S.Ct. 1361.

In the second category, where the Court has refused to find a diminishment, the acts or agreements contained no language of cession and the surrounding circumstances supported the conclusion that relinquishment of unallotted lands was not intended to reduce the size of the reservation. *See Solem,* 465 U.S. at 472–73, 104 S.Ct. 1161 (operative language of act merely authorized the Secretary of the Interior "to sell and dispose" of specified land; observing that "provisions stand in sharp contrast to the explicit language of cession" at issue in *Rosebud Sioux* and *DeCoteau* ); *Mattz,* 412 U.S. at 495, 93 S.Ct. 2245 (no intent to diminish where act declared land "subject to settlement, entry, and purchase under the laws of the United States"); *Seymour,* 368 U.S. at 355–56, 82

S.Ct. 424 (unlike prior act vacating and restoring land to public domain, act merely opening surplus lands to entry and settlement under homestead laws was intended "neither to destroy the existence of the diminished Colville Indian Reservation nor to lessen federal responsibility for and jurisdiction over the Indians having tribal rights on that reservation. The text did no more than open the way for non-Indian settlers to own land on the reservation."). In neither group of cases did the Court address the fate of *allotted* lands.

9. Although, on remand, the Eighth Circuit has recently held that the Yankton Sioux reservation was diminished not only by the amount of surplus lands ceded, but also by the allotted lands which passed into non-Indian hands, the decision turns on a historical context radically different from that of the Nez Perce. *See Yankton Sioux Tribe v. Gaffey,* 188 F.3d 1010 (8th Cir.1999). As the discussion in Section III.D reveals, the savings clause in the Yankton Sioux surplus land agreement is also materially different from the savings clause in the 1893 Agreement.

Nor are we foreclosed by *Dick v. United States,* 208 U.S. 340, 342, 28 S.Ct. 399, 52 L.Ed. 520 (1908), in which the Supreme Court considered a claim that the Nez Perce Reservation was "relinquished to the State of Idaho," under the doctrine of equal footing when Idaho was admitted into the Union in 1890. George Dick, who was charged with introducing "intoxicating liquor" into Indian country, challenged the jurisdiction of the federal district court on the grounds that the offense did not occur within Indian country because, inter alia, allotment of Nez Perce Reservation lands under the Dawes Act extinguished tribal title. Although the Court held that, at least under the federal liquor statute, Indian country did not embrace land as to which Indian title had been extinguished, the case is inapposite because the criminal conduct at issue took place on surplus, ceded lands, *see* 208 U.S. at 351, 28 S.Ct. 399, and at the time of the decision, Congress had not yet adopted the current, expansive definition of Indian country codified at 18 U.S.C. § 1151, which does not restrict federal jurisdiction to reservation lands still under Indian ownership.

over, under the canons of construction disfavoring diminishment, this showing must be unequivocal.

The district court correctly held that Webb failed to meet his burden. Indeed, the conclusion that the 1893 Agreement altered the boundaries of the reservation is repelled by the record. First, there is no mention of a change in reservation boundaries in the 1893 Agreement or its ratifying instrument. Second, the Agreement contains a savings clause added at the insistence of the Nez Perce due to their profound and repeatedly expressed concern about preserving the rights created by the 1863 Treaty. As long as retention of the 1863 reservation boundaries is consistent with the terms of the 1893 Agreement, there is no diminishment or disestablishment.

The Ninth Circuit and the Supreme Court have held that neither allotment, in and of itself, nor the grant of citizenship to Indians holding allotted land under the Dawes Act, revokes the reservation status of such land. *See Mattz*, 412 U.S. at 497, 93 S.Ct. 2245 ("allotment under the 1892 Act is completely consistent with continued reservation status"; "[t]he presence of allotment provisions ... cannot be interpreted to mean that the reservation was to be terminated"); *Celestine*, 215 U.S. at 289–90, 30 S.Ct. 93 ("although made a citizen of the United States and of the state, it does not follow that the United States lost jurisdiction over him for offenses committed within the limits of the reservation"); *Eells v. Ross*, 64 F. 417 (9th Cir.1894) (authority to remove non-Indian from allotted trust patent land upheld against claim that property was no longer part of reservation due to allotment; neither allotment nor granting of citizenship to Indian holding trust patent altered or abolished reservation status of land), *quoted with approval in Celestine*, 215 U.S. at 287–88, 30 S.Ct. 93.

The Supreme Court has also emphasized that, even if cultural assimilation and white settlement of surplus land were goals of the Dawes Act, Congress did not intend to immediately eradicate the reservation system. *See Solem*, 465 U.S. at 468–69, 104 S.Ct. 1161 ("Although the Congresses that passed the surplus land acts anticipated the imminent demise of the reservation and, in fact, passed the acts partially to facilitate the process, *we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land act.* Rather it is settled law that some surplus land acts diminished reservations, and other surplus land acts did not. The effect of any given surplus land act depends on the language of the act and the circumstances of its passage.") (citations omitted) (emphasis added); *Mattz*, 412 U.S. at 504, 93 S.Ct. 2245 (observing that Congress knew how to require termination or disestablishment of reservations by express language in surplus land acts when it so desired); *id.* ("The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated. This is apparent from the very language of 18 U.S.C. § 1151, defining Indian country 'notwithstanding the issuance of any patent' therein."); *Seymour*, 368 U.S. at 357–58, 82 S.Ct. 424 (rejecting claim that reservation was diminished by virtue of purchase of land within by non-Indians).[10]

As to the circumstances surrounding the 1893 Agreement, a review of the pertinent evidence discloses nothing to impeach the district court's findings that: (1) no change in the boundaries of the Nez Perce Reservation was contemplated in the negotiations between federal agents and the tribe, (2) the Nez Perce had no word for "cede" and the minutes of the negotiations make clear that the parties spoke predominantly in terms of a sale or purchase of land, not

---

**10.** The Court's rule should not be surprising given that Congress, the branch vested with plenary powers in Indian affairs, "formally repudiated" the allotment and assimilation policy in the Indian Reorganization Act of 1934, 25 U.S.C. § 461. *See Yankton Sioux*, 522 U.S. at 339, 118 S.Ct. 789.

in terms of the termination of reservation status or the diminishment of the reservation boundary,[11] (3) while opening of the reservation to white settlement was certainly contemplated, no legislators mentioned or discussed the boundaries of the reservation or intimated that the boundaries would be changed by ratification of the 1893 Agreement,[12] (4) the Acting Commissioner of Indian Affairs stated that the 1893 Agreement "makes no change in the boundaries of [the Nez Perce] reservation," [13] (5) records of the negotiations reveal that "the Nez Perce believed the boundaries were necessary in order to keep trespassers off the reservation and to have the government assist them in doing so," Order Denying MTD at 13, (6) from the initial 1855 Treaty to the present, the Bureau of Indian Affairs has provided services to the Nez Perce consistent with the existence of a reservation,[14] (7) "since 1894,

11. The government expert's report on the negotiation history states that "[t]he Council minutes make it clear that the Agreement was a mere *property transaction* with no change in boundaries intended." Denis C. Colson, *The Legislative History of the 1893 Nez Perce Agreement* § 4.B at 14 (June 3, 1998) (emphasis added). He adds that the minutes show the Commissioners used words like "sell," "buy" and "purchase" 31 times and referred to "cession," "cede" or "relinquish," just four times. *Id.* at 15. The Nez Perce referred exclusively to "sell," "sale," "purchase," "let it go," and "dispose," not "cede." *Id.* The expert also points out, and the district court noted, that in referring to the Agreement as a mere property transaction, the parties frequently compared the deal to the sale of horses. *Id.* at 15–16. The cession language in the Agreement was boilerplate from the model agreement brought by the Commissioners.

12. To the degree that legislators focused at all on the terms of the 1893 Agreement during the ratification debates, they stressed the accuracy of the purchase price and the purported value of the land, not issues like assimilating the Nez Perce, diminishing the reservation boundaries, or ending the reservation system. *See* Colson, *Legislative History* § 6 at 26–42 (quoting extensively from the floor debates).

13. This is a particularly compelling quote since it refers *directly* to the reservation boundaries and the question of diminishment. The statement comes from a letter written by the Acting Commissioner of Indian Affairs in 1894, after the Agreement was signed but before Congress ratified it. A map company wrote to the Acting Commissioner when it heard about the 1893 Agreement and asked for the "correct boundaries" of the "diminished Nez Perce Indian Reservation in Idaho." The Acting Commissioner responded:

> I am in receipt of your communication dated May 9, 1894, in which you request to have indicated on an enclosed map clipping the correct boundaries of the diminished Nez Perce Reservation in Idaho.

> In reply I have to advise you that the boundaries of the present Nez Perce Reservation appear to be correctly laid down upon the map enclosed by you. *If by the diminished reservation you refer to the cession of the surplus lands of that reservation made by a recent agreement with said Indians (but which has not yet been ratified by Congress), I have to advise you that said agreement makes no change in the boundaries of that reservation.* The Indians cede to the United States all the lands not taken by them in allotment, except some 30,000 acres of timber land situated in various parts of the reservation as at present existing.

Letter from Acting Commissioner of the Office of Indian Affairs, Dept. of Interior, to The Matthews Northrup Co. (June 7, 1894) (emphasis added). P. Allen, who was one of the Commissioners sent to negotiate the 1893 Agreement with the Nez Perce, is copied in the letter. *See id.* As the district court recognized, this letter is direct, contemporaneous evidence from the agency responsible for obtaining the tribe's consent to the 1893 Agreement that the boundaries of the reservation were untouched by the cession of surplus lands. Indeed, it would be difficult to imagine a more straightforward rebuttal of the presumption of diminishment created by sum certain, cession language.

14. In a declaration submitted for the government, the Area Director for the Portland Area Office of the Bureau of Indian Affairs avers that the diminishment argument appears to be "of recent vintage" and that "during my term ... the Bureau has recognized and treated the Reservation as encompassing the territory within the boundaries established by the 1863 Treaty." Decl. of Stanley Speaks ¶ 3 (June 4, 1998). Moreover, "this modern Bureau practice is consistent with the history of Bureau presence and activities on the Reservation" and "Bureau programs and services are administered for the benefit of the Nez Perce Tribe and its members on the basis that they are programs applicable within the

Congress has legislated with the 1863 boundaries in mind," Order Denying MTD at 16, and (8) " '[t]he jurisdictional history shows that federal, tribal, and state governments have all assumed that the 1863 Reservation was not changed by Congressional ratification of the 1893 Agreement.' " *Id.* (quoting Dennis C. Colson, Jurisdictional History of the 1893 Nez Perce Agreement § 1 at 1 (June 8, 1993)).[15]

Thus, there is no inconsistency created by enforcing the savings clause and preserving the reservation status of lands allotted to the Nez Perce. Although the *Yankton Sioux* Court refused to give similar effect to a savings clause, the clause at issue there contained no consistency qualifier. Its literal construction would have nullified the entire agreement since it required that all the terms of the prior treaty be given "full force and effect, the same as though this agreement had not been made." [16] To avoid the absurd effect of a literal construction, the Court read the clause narrowly to preserve only the tribe's treaty right to receive annuities from the federal government—an issue which apparently "dominated the 1892 negotiations between the Commissioners and the Tribe." *Id.* at 346, 118 S.Ct. 789; *see id.* at 348, 118 S.Ct. 789 ("apart from the pledge to pay annuities, it is hard to identify any provision in the 1858 Treaty that the Tribe might have sought to preserve").

Moreover, the record of negotiations with the Yankton Sioux disclosed a desire to "dissolve[ ] tribal governance," *Yankton Sioux*, 522 U.S. at 353, 118 S.Ct. 789, a motivation utterly absent from the Nez Perce negotiations. By the time of the surplus lands agreement the Yankton Sioux had been reduced to subsistence living and were almost completely dependent on federal rations. They also openly supported ratification of the agreement by Congress and concurred in the commissioner's view that "their tribal interests may be considered a thing of the past." *Id.* The commissioners sent to negotiate with the Nez Perce, by contrast, barely succeeded in gaining assent to sell the surplus lands, and were forced to make concessions in recognition of tribal authority and interests. Accordingly, the commissioners neither spoke in terms of nor obtained concessions in tribal sovereignty or reservation status. And in contrast to the Yankton Sioux's support of the ratification, members of the Nez Perce traveled to Washington specifically to oppose ratification. *See* Colson, *Legislative History* § 5.A 20–21.

The *Yankton Sioux* Court rejected the contention that retaining the reservation status of *ceded lands* could be consistent with the surplus land agreement because the argument for retention "contradicts the common understanding of the time: that tribal ownership was a critical compo-

---

boundaries of the 1863 Treaty Reservation." *Id.* at ¶ 4, 6 (describing programs).

15. The evidence is not unequivocal. Webb and amici cite a number of post hoc references to the "former" reservation. But as the government's expert testified, those references are scattered, inconsistent, mostly offhand statements, and "the predominant pattern is references to the reservation as if it exists at the time the document was prepared." Motion Hearing Testimony of Dennis C. Colson, at 46 (Dec. 9, 1998). Moreover, the bulk of Webb's proof falls into the category deemed least probative by the Supreme Court (events after ratification of the Agreement). *See Solem,* 465 U.S. at 471–72, 104 S.Ct. 1161. Even if it were fully credited, the countervailing evidence at best creates an

ambiguity as to congressional intent which would have to be resolved in favor of the tribe.

16. The *Yankton Sioux* savings clause provided:

> Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858.... And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty ... *shall be in full force and effect, the same as though this agreement had not been made,* and the said Yankton Indians shall continue to receive their *annuities* under the said treaty....

522 U.S. at 337–38 n. 1, 118 S.Ct. 789 (emphasis added).

nent of reservations status." 522 U.S. at 346, 118 S.Ct. 789 (citing *Solem*, 465 U.S. at 468, 104 S.Ct. 1161). However, as the *Solem* decision makes clear, the nineteenth century concept of "tribal ownership" was unquestionably broad enough to encompass *allotted lands:*

> Unfortunately, the surplus land acts themselves seldom detail whether opened lands retained reservation status or were divested of all Indian interests. When the surplus land acts were passed, the distinction seemed unimportant. The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century. *Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians.* Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries. 18 U.S.C. § 1151.

465 U.S. at 468, 104 S.Ct. 1161 (emphasis added) (citations omitted). In our case we have specific evidence of the effect of the Agreement that properly displaces general inferences drawn from "the common understanding of the time" and the "guiding philosophy" of the Dawes Act. *Yankton Sioux*, 522 U.S. at 346, 347, 118 S.Ct. 789. The historical information independently confirms that there was no intent to diminish or disestablish the Nez Perce Reservation.

## IV. CONCLUSION

The decision of the district court denying the motion to dismiss the indictment is **AFFIRMED.**