SHAWNEE TRIBE, A Federally
Recognized Indian Tribe, et
al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. 03–2042–GTV.

United States District Court,
D. Kansas.

March 30, 2004.

Jennifer M. Gibson Hannah, R. Scott Beeler, Lathrop & Gage, LC, Overland Park, KS, for Plaintiff.

David D Zimmerman, Melanie D. Caro, Office of United States Attorney, Kansas City, KS, for Defendants.

## MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

This case arises out of the impending disposal by the United States government of the Sunflower Army Ammunition Plant ("SFAAP"), a 9,065–acre parcel of land located near DeSoto, Kansas. The United States has declared the SFAAP to be excess property available for disposal pursuant to the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471 et seq. Plaintiff Shawnee Tribe[1] contends that the property is located within the boundaries of the Shawnee Indian reservation, thus the Tribe applied to the General Services Administration and to

---

1. The Tribe also filed this action on behalf of "its members who are descendants of allottees who received land on the Shawnee Reservation pursuant to the Treaty with the Shawnee of 1854." For simplicity, the court will refer only to Plaintiff Shawnee Tribe throughout this Memorandum and Order.

the Bureau of Indian Affairs, requesting transfer of the land in trust to the Department of the Interior for the Shawnees' benefit as provided in the Act. The General Services Administration denied the transfer request on the ground that the excess property does not lie within the boundaries of the Shawnee Tribe's Indian reservation. The Tribe now seeks judicial review of the transfer denial, and has filed an Administrative Procedures Act ("APA") brief.

Defendants responded to the Shawnee Tribe's APA brief and filed a motion to dismiss or for summary judgment (Doc. 51) with respect to the remainder of the Tribe's claims. Defendants essentially claim that the court lacks jurisdiction over all the Tribe's claims except for its APA claim. The court heard oral argument on February 13, 2004, and is now prepared to rule.

For the following reasons, the court determines that the federal agency's decision was within the scope of its authority, and was not arbitrary, capricious, and/or an abuse of discretion, and that Congress had terminated the Shawnee reservation in 1854. This decision renders the rest of the Tribe's claims moot. The court therefore grants Defendants' motion to dismiss the remainder of the Tribe's claims (Doc. 51). The Tribe also filed a motion for a preliminary injunction (Doc. 13) that the parties have agreed is unnecessary to resolve at this time. The court denies that motion as moot.

## I. STANDARD OF REVIEW

■ Under the Administrative Procedures Act, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702; *see Catron County Bd. of Comm'rs v. Fish & Wildlife Serv.,*

75 F.3d 1429, 1434 (10th Cir.1996) (citation omitted). But the "ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ The APA authorizes the reviewing court to "compel agency action unlawfully withheld" and to "hold unlawful and set aside agency actions, findings, and conclusions" that the court finds to be, as the Shawnee Tribe alleges here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 706(1), 706(2)(A); *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 415–16, 91 S.Ct. 814; *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1573–75 (10th Cir. 1994). Under an APA review, " 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.' " *Olenhouse,* 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *see Indus, Union Dep't, AFL–CIO v. Amer. Petroleum Inst.,* 448 U.S. 607, 631 n. 31, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980). The Tenth Circuit has identified the "essential function" of agency review as an analysis of the following: "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse,* 42 F.3d at 1574 (citations omitted).

■ " 'The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.' " *Cliffs Synfuel Corp. v. Norton,* 291 F.3d 1250, 1257 (10th Cir.2002) (quoting *Olenhouse,* 42 F.3d at 1574 (footnote omitted)).

The reviewing court must decide " 'whether the agency considered all relevant factors and whether there has been a clear error of judgment.' " *Id.* (quoting *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals,* 206 F.3d 1003, 1012 (10th Cir.2000)) (further quotation omitted).

## II. FACTUAL BACKGROUND

In 1817, there were two primary groups of Shawnee Indians, one living in Missouri, and one living in Ohio. *Kansas Indians,* 5 Wall. 737, 72 U.S. 737, 738, 18 L.Ed. 667 (1866). In 1825, the Missouri Shawnee Tribe entered into a treaty with the United States, ceding its lands near Cape Girardeau, Missouri in exchange for a tract of land in what later became the Territory of Kansas. The tract, approximately twenty-five miles by one hundred miles, comprised over 1.6 million acres and included all of the SFAAP lands. In 1831, the Ohio Shawnees signed a treaty with the United States whereby it gave up its land in Ohio, and in consideration received 100,000 acres of the 1.6 million acre reservation in Kansas. Article X of the 1831 Treaty created the following express obligations of the United States pertaining to the Shawnee reservation:

> The lands granted by this agreement and convention to the said band or tribe of Shawnee, shall not be sold or ceded by them, except to the United States, and the United States guarantee that the said lands shall never be within the bounds of any state or territory, nor subject to the laws thereof: And further, that the President of the United States will cause said tribe to be protected at their intended residence, against all interruptions or disturbances from any other tribe or nations of Indians, or from any other person or persons whatever. . . .

On March 3, 1853, Congress authorized the United States President to negotiate with Indian tribes west of Missouri and Iowa "for the purpose of 'securing the assent of said tribes to the settlement of the citizens of the United States upon the lands claimed by said Indians, and for the purpose of extinguishing the title of said Indians, in whole or in part, to said lands. . . .' " *Absentee Shawnee Tribe v. United States,* Dkt. 334, Ind. Cl. Comm., at 377, 379 (1958) (quoting Act of Congress of March 3, 1853, 10 Stat. 226, 238). Pursuant to the 1853 Act, the President designated the Commissioner of Indian Affairs, George W. Manypenny, to negotiate with the Indians. *Id.* Commissioner Manypenny did not reach an agreement with the Shawnee Tribe at that time because the "tribes willing to cede their lands desired to retain portions of their reservations." *Id.* at 380.

In 1854, the Shawnee Tribe signed a treaty that ceded all of its 1.6 million acres to the United States, "excepting and reserving therefrom two hundred thousand acres for homes for the Shawnee people. . . ." Congress did not ratify the 1854 Treaty with this verbiage. Before ratifying the instrument, Congress required that the Treaty be amended to reflect a two-step transaction: In Article 1 of the Treaty, the Shawnee Tribe ceded the 1.6 million acres to the United States; then, in Article 2, the United States receded a 200,000–acre tract from within the 1.6 million acres to the Shawnee Tribe. The Tribe and the government accepted the amendments.

As consideration, the United States paid the Tribe $829,000 for the net land that it received. The United States also paid an additional $27,000 "in full satisfaction not only of such claim [for damage to crops, stock, etc. from emigration] but of all others of what kind soever, and in release of all demands and stipulations arising under former treaties, with the exception of the perpetual annuities. . . ."

The treaty "'did not contemplate that the Indians should enjoy the whole [200,-000–acre] tract.'" *Absentee Shawnee Tribe v. Kansas,* 862 F.2d 1415, 1419 (10th Cir.1988) (quoting *Kansas Indians,* 72 U.S. at 753, 72 U.S. 737). Shawnee Tribe members were entitled to choose 200–acre allotments from the tract. After five years, the United States agreed to sell the unallotted parcels and hold the proceeds for an additional five years before distributing them for the benefit of the Shawnees. If any absentee Tribe members appeared within the ten-year period, those members were entitled to the value of their promised allotment.

The 200,000–acre tract includes all of the SFAAP's 9,000 acres. A number of allotments made pursuant to the 1854 Treaty were made to Tribe members either entirely or partially within what is now the SFAAP. But approximately half of the SFAAP was not allotted to Tribe members.

In 1869, the Shawnee Tribe negotiated an agreement with the Cherokee Nation, then residing in Oklahoma. Pursuant to that agreement, the Shawnees agreed to be "incorporated into and ever remain a part of the Cherokee Nation," and further agreed "that the said Shawnees shall abandon their tribal organization." Agreement Between Shawnees and Cherokees, Concluded June 7, 1869, Approved by the President June 9, 1869. Many of the Shawnees, including members of the Tribe who had received allotments of land within the SFAAP, transferred title to their land with the express approval of the Secretary of the Interior.

By 1941, the United States Army had acquired the SFAAP and began operating an ammunition plant on the land. During the 1990s, the Army determined that it no longer needed the SFAAP, and requested that the General Services Administration ("GSA") dispose of the property.

On January 7, 1998, the GSA prepared a Notice of Availability for Excess Real Property. On February 10, 1998, the GSA submitted the Federal Screening Notice to the Bureau of Indian Affairs ("BIA"). The GSA asked the BIA to respond by March 13, 1998 if the SFAAP was eligible to be transferred to the BIA in trust for Indians. After the BIA did not request a transfer of the SFAAP property, the GSA proceeded with the property disposal process.

On December 27, 2000, Congress restored the Shawnee Tribe's "current and historical responsibilities, jurisdiction, and sovereignty" over its people and properties. 25 U.S.C. § 1041 (2001). Congress recognized that the Shawnees had "continued to maintain the Shawnee Tribe's separate culture, language, religion, and organization, and a separate membership roll," but did not conclude that the Shawnee Tribe had maintained a separate government.

The Shawnee Tribe submitted a request on July 3, 2001, to the Secretary of the Interior, requesting that the SFAAP be transferred to the Department of the Interior ("DOI") in trust for the Tribe's benefit. On October 30, 2001, January 18, 2002, and April 18, 2002, the Tribe submitted additional requests to the GSA for transfer of the SFAAP to the DOI. The Tribe claimed that the GSA should transfer the property pursuant to 40 U.S.C. § 523, which provides for transfer of excess real property located within an Indian reservation to the DOI, to be held in trust for the benefit of the tribe.

On September 6, 2002, the GSA wrote to the BIA, requesting a "post haste" determination on the SFAAP/Indian reservation issue. On September 19, 2002, Kansas Governor Bill Graves wrote to Gail Norton, Secretary of the Interior, voicing his strong opposition to the Shawnee Tribe's claim to the SFAAP and requesting a

quick decision from the BIA that the Tribe had no interest in the SFAAP land.

On December 6, 2002, the DOI, through the BIA's Assistant Secretary for Indian Affairs, provided an opinion letter to the GSA stating:

> Upon receipt of your inquiry, departmental staff engaged upon a thorough review of documents and materials relevant to this issue, including, but not limited to, property records maintained by the Shawnee Tribe in support of their claim that the Sunflower site lies within the exterior boundaries of their reservation, and certain treaties and statutes pertaining to the Shawnee Tribe and/or their lands. Based on this review it is our opinion that the Sunflower Army Ammunition Depot does not lie within the present day exterior boundaries of the Shawnee Tribe's reservation.

After receiving the DOI's determination, the GSA issued its decision in February 2003 concerning the Shawnee Tribe's property transfer request for the SFAAP, stating:

> Concerning the [40 U.S.C. § ] 523 transfer request, the GSA has carefully reviewed the December 6, 2002 letter from Mr. Neal McCaleb, Assistant Secretary for Indian Affairs, U.S. Department of the Interior ('DOI'). In reliance upon the DOI determination that Sunflower does not lie within the present day exterior boundaries of the Shawnee Tribe 'Indian Reservation,' you are advised that the Shawnee Tribe is not eligible for transfer consideration of any of the Sunflower Army Ammunition Plant ... pursuant to 40 U.S.C. § 523.

**2.** Transfer is only mandatory if three requirements are met: (1) the property is within an Indian reservation; (2) the property is "excess"; and (3) the reservation belongs to a federally-recognized Indian tribe. 40 U.S.C.

## III. DISCUSSION

### A. Administrative Procedures Act Claim

#### 1. Failure to Act within Scope of Authority

The threshhold issue before the court is whether the SFAAP is within the boundaries of the Shawnee reservation. If it is, then disposal of the property may be subject to certain mandatory requirements.[2] 40 U.S.C. § 523, the statute under which the Tribe claims it is entitled to the property, provides as follows:

> The Administrator of General Services shall prescribe procedures necessary to transfer to the Secretary of the Interior, without compensation, excess real property located within the reservation of any group, band, or tribe of Indians that is recognized as eligible for services by the Bureau of Indian Affairs.

"[T]ransfers to DOI of excess real property located within an Indian reservation are mandatory regardless of whether DOI requests transfer and must be made without compensation. These transfers may not be made to any other agencies...." GSA Order PBS P.4000.1, 12(a)(2). If the SFAAP is within the boundaries of the Shawnee reservation, then the GSA's failure to transfer the land to the DOI in trust for the Shawnees may not have been within the scope of its authority.

 The court will uphold GSA's determination that the SFAAP was not within the boundaries of the Shawnee reservation if the reservation has been terminated. Courts should not "lightly conclude that an Indian reservation has been terminated." *DeCoteau v. Dist. County*

§ 523. Because this court determines that the SFAAP is not within a reservation, the second two requirements are not at issue in this Memorandum and Order.

*Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Once Congress has established a reservation, it remains a reservation until Congress clearly indicates that the reservation is extinguished. *Id.; see also Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.") (citation omitted). "[C]ongressional intent must be clear, to overcome 'the general rule that [d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *DeCoteau,* 420 U.S. at 444, 95 S.Ct. 1082 (quoting *McClanahan v. Ariz. State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)) (further quotation and internal quotation marks omitted). "The 'traditional solicitude for the Indian tribes,' however, precludes the courts from diminishing Indian lands without 'substantial and compelling evidence of a Congressional intention' to exercise its power to diminish Indian lands." *Absentee Shawnee Tribe,* 862 F.2d at 1418 (quoting *Solem,* 465 U.S. at 472, 104 S.Ct. 1161).

■ Congress may terminate an Indian reservation by unilateral act or by ratification of a treaty between the United States and a tribe. *See* F. Cohen, *Handbook of Federal Indian Law* 43 (1982). In the instant case, Congress requested amendments and ratified an amended version of a treaty with the Shawnees. Because both a Congressional act and a negotiated treaty are involved, the court also looks to the legal standards for interpreting Indian treaties.

■ "[E]nlarged rules of construction are adopted in reference to Indian treaties." *Kansas Indians,* 72 U.S. at 760, 72 U.S. 737. The court should construe ambiguous provisions to the benefit of the Indians. *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). "'The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.'" *Absentee Shawnee Tribe,* 862 F.2d at 1418 (quoting *Worcester v. Georgia,* 31 U.S. 515, 582, 6 Pet. 515, 8 L.Ed. 483 (1832)) (additional citations omitted).

■ When ascertaining Congressional intent to terminate a reservation, several factors are important: (1) the plain language utilized; (2) the circumstances surrounding the treaty; and (3) the legislative history. *DeCoteau,* 420 U.S. at 444, 95 S.Ct. 1082 (citations omitted); *see also Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Hagen v. Utah,* 510 U.S. 399, 411, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). The Tribe also asks the court to consider subsequent references to the land by the GSA and courts. *See, e.g., Solem,* 465 U.S. at 471, 104 S.Ct. 1161. The court will discuss each of these factors.

### a. Language of 1854 Treaty

■ After examining the plain language of the 1854 Treaty, the court determines that Congress intended to terminate the Shawnee reservation when it ratified the treaty. The 1854 Treaty, as ratified by Congress, frames the agreement between the United States and the Shawnee Tribe as follows:

Article 1. The Shawnee tribe of Indians hereby cede and convey to the United States, all the tract of country lying

west of the State of Missouri, which was designated and set apart for the Shawnees in fulfilment of, and pursuant to, the second and third articles of a convention made between William Clark, superintendent of Indian affairs, and the chiefs and head-men of the Shawnee Nation of Indians, at St. Louis, on the seventh day of November, one thousand eight hundred and twenty-five....

Article 2. The United States hereby cede to the Shawnee Indians two hundred thousand acres of land, to be selected between the Missouri State line, and a line parallel thereto, and west of the same, thirty miles distant; which parallel line shall be drawn from the Kansas River, to the southern boundary-line of the country herein ceded....

Article 3. In consideration of the cession and sale herein made, the United States shall agree to pay to the Shawnee people the sum of eight hundred and twenty-nine thousand dollars....

Defendants submit that this language is nearly identical to the treaty language in *DeCoteau v. District County Court.* In *DeCoteau,* the Supreme Court held that Congress terminated a Sioux reservation in 1891 when it ratified a treaty with the Sisseton and Wahpeton bands of the Sioux Indians. 420 U.S. at 426–27, 95 S.Ct. 1082. The Sioux brought the case to challenge a South Dakota state court's assertion of jurisdiction over them for conduct occurring on unallotted land within the borders of the 1867 Sioux reservation. *Id.* at 428, 95 S.Ct. 1082. The terms of the *DeCoteau*

treaty provided that "the [Indians] hereby cede, sell, relinquish, and convey to the United States all ... the unallotted lands within the limits of the reservation remaining after the allotments and additional allotments provided for in article four ... shall have been made." *Id.* at 456, 95 S.Ct. 1082. It also provided that the tribe would receive $2.50 per acre. *Id.* The Supreme Court found it persuasive that the agreement with the Sioux "was unique in providing for cession of all, rather than simply a major portion of, the affected tribe's unallotted lands." *Id.* at 446, 95 S.Ct. 1082. For these reasons, as well as others that will be explained later, the Supreme Court held that Congress intended to terminate the 1867 Sioux reservation, thereby giving the state court jurisdiction over the unallotted land. *Id.* at 427–28, 95 S.Ct. 1082.

Like the treaty in *DeCoteau,* the 1854 Treaty stated that all of the Shawnee land was ceded, and specified a price for the land. The two-step structure of the 1854 Treaty provided first that all of the land was ceded to the United States, and then that the United States receded some of the land to the Shawnees. The court finds the deliberate use of this two-step structure indicative of intent to terminate the Shawnee reservation before receding land to the Tribe from which members could choose allotments. The fact that the government paid the Tribe a sum certain for the net land, $829,000, also suggests that Congress intended to terminate the reservation. *See Absentee Shawnee Tribe,* 862 F.2d at 1420 n. 3.[3]

---

**3.** In *Absentee Shawnee Tribe,* the Tenth Circuit stated:

In determining congressional intent to diminish Indian land, the *Solem* Court found critical the facts that (1) the act in question made explicit reference to *cession* of the land; and (2) Congress made an unconditional commitment to compensate the Indian tribe for the land. The court held that when this is the case "there is an almost

insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Solem,* 465 U.S. at 470–71, 104 S.Ct. 1161.... Although diminishment concerns are not implicated in this case, we find these same factors persuasive here in interpreting the intent of both the Indians and Congress.

862 F.2d at 1420 n.3.

The Tribe points out that the United States only paid for 1.4 million acres, not the full 1.6 million acres. The Tribe argues that if all 1.6 million acres had been ceded, the Shawnees would have been compensated for all 1.6 million acres, but the government paid the Tribe $829,000, which represented payment for only 1.4 million acres of land. *See* Treaty with the Shawnee, 1854, May 10–Sept. 28, 1854, U.S.-Shawnees, art.3, 10 Stat. 1053; *Absentee Shawnee Tribe*, Dkt. 334, Ind. Cl. Comm., at 381–82.

The Tribe's rationale conflicts with the plain language of the treaty and the Supreme Court's notation in *Kansas Indians* that the 1854 Treaty "ceded to the United States the whole tract of 1,600,000 acres." 72 U.S. at 739. Moreover, the government agreed to sell all unallotted land after five years and hold the proceeds for an additional five years before using the proceeds for the benefit of the Shawnees. Treaty with the Shawnee, 1854, art. 2, 10 Stat. at 1054. The court determines that the Tribe was compensated, in one form or another, for all 1.6 million acres.

The Tribe also argues that the use of the term "reserved" in Article 2 of the 1854 Treaty indicates that Congress did not intend to terminate the reservation. Article 2 provides that "[a]ll the land selected, as herein provided, west of said parallel line, and that set apart to the respective societies for schools, and to the churches before named, shall be considered as part of the two hundred thousand acres *reserved* by the Shawnees." *Id.* (emphasis added). The Tribe contends that Congress would not have used the term "reserved" if the 200,000 acres did not constitute a reservation.

The Tenth Circuit has specifically analyzed Article 2's use of the term "reserved." In *Absentee Shawnee Tribe*, the court rejected construction of the term "reserved" in its technical sense. 862 F.2d

at 1420. The court held that "the use of the term 'reserved' in this context is highly suspect, given that the first sentence of article 2 had originally contained the term 'reserved,' but was subsequently amended to omit that term." *Id.* The court relayed the following history of the treaty:

> In the original draft of the Treaty, the Shawnees were to have reserved the 200,000 acre tract out of the 1.6 million acres they ceded to the United States. Instead, the Shawnees ceded the entire 1.6 million acre tract to the United States, and the United States receded two hundred thousand acres to them. Article 2's original provision referring to the land within the boundaries defined in article 1, "[t]he two hundred thousand acres of land reserved by the Shawnees," was therefore amended to read "[t]he United States hereby cede to the Shawnee Indians two hundred thousand acres of land to be selected between [specified boundaries]". In this context, therefore, the term "reserved" is merely a means of describing the two hundred thousand acres of land in which they would have the right to select property, and it does not necessarily indicate that the Shawnees understood that all of the land was, and would always be, "Indian land."

*Id.* The final version of the 1854 Treaty also uses the term "reserve" to describe land retained by the United States—Article 16 states, "The United States reserve, at the site of the agency-house in the Shawnee country, including the improvements, one hundred and sixty acres of land."

This court follows the rationale of the Tenth Circuit in *Absentee Shawnee Tribe*. The fact that Congress required amendment of the treaty to delete the portion that "reserved" 200,000 acres to the Shawnees before ratifying the treaty indicates

that Congress intended to terminate the reservation before conveying land back to the Tribe. Moreover, because the term "reserved" is used in reference to land belonging to the Tribe as well as land belonging to the United States, it is unlikely that the drafters of the treaty intended for the word to be interpreted only in the strict sense of an Indian reservation.

The Tribe next focuses on the treaty's lack of express language stating that the reservation was being extinguished. *Contra Mattz v. Arnett*, 412 U.S. 481, 505 n. 22, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (noting that Congress has used clear language of express termination when that result is desired—e.g., 15 Stat. 221 (1868) ("[T]he Smith reservation is hereby discontinued."); 27 Stat. 63 (1892) (providing that the North Half of the Colville Indian Reservation "be, and is hereby vacated and restored to public domain"); 33 Stat. 218 (1904) ("[T]he reservation lines of the said Ponca and Otoe and Missouri Indian reservations be, and the same are hereby abolished.")).

The cases and statutes cited by the Tribe postdate the 1854 Treaty and its ratification. The court will not infer that because Congress elected to specifically "discontinue" a reservation in 1868, Congress recognized in 1854 that it should use similar language to effectively terminate the Shawnee reservation. The Tribe's argument would be more persuasive if the cases and statutes cited predated the 1854 Treaty and its ratification. Nevertheless, the court determines that even in the absence of express termination language, the two-step structure Congress crafted before ratifying the 1854 Treaty sufficiently expressed Congress's intent to terminate the reservation.

Finally, the Tribe reminds the court that although the language in the 1854 Treaty and the *DeCoteau* treaty may be similar, the mere similarity of treaty language does not necessarily have the same effect in different agreements:

> The ... argument that similar language in two Treaties involving different parties has precisely the same meaning reveals a fundamental misunderstanding of basic principles of treaty construction.... The review of history and the negotiations of the agreement is central to the interpretation of treaties.

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). The Tribe directs the court to two other cases considering similar treaty language where the courts held that a reservation was not terminated. *See Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1019–20 (8th Cir. 1999) (holding that inclusion of cession and sale language in an agreement between the United States and tribe, thereby ceding, selling and relinquishing all rights to all unallotted land served to merely diminish the boundaries of the reservation, but not terminate the reservation); *United States v. Webb*, 219 F.3d 1127, 1133 (9th Cir.2000) (holding that absent evidence that the tribe and Congress contemplated and intended reservation status to end or unequivocal language of termination, the Supreme Court has never held that allotted lands were severed from a reservation by an agreement for the cession and sale of surplus lands).

The court is not basing its decision solely on the similarity of the language in the 1854 Treaty and the *DeCoteau* treaty. As previously noted, the court finds the structure of the 1854 Treaty, as amended before ratification by Congress, highly probative of Congress's intent. Comparison of the language in the 1854 and *DeCoteau* treaties supports the court's decision, but is not its lone impetus.

In sum, the court is not persuaded by the Tribe's arguments. The plain lan-

guage and structure of the 1854 Treaty indicate an intent to transfer all of the Shawnee reservation to the United States, effectively terminating the reservation. The United States then gave members of the Tribe the opportunity to choose allotments from 200,000 acres of the former reservation. Such conveyance was ineffective to reestablish a reservation previously terminated.

### b. Surrounding Circumstances and Legislative History

■■■ The surrounding circumstances and legislative .history also support a determination that Congress intended to terminate the Shawnee reservation when it ratified the 1854 Treaty. The court will examine these two factors together, as they are intertwined in this case.

In *DeCoteau,* the Supreme Court held that " 'the face of the Act [ratifying the Sioux treaty],' and its 'surrounding circumstances' and the 'legislative history,' all point unmistakably to the conclusion that the Lake Traverse Reservation was terminated in 1891." 420 U.S. at 445, 95 S.Ct. 1082. The *DeCoteau* Court observed that the legislative history supported its finding that the Act terminated the reservation, as shown by comments of the sponsors of the legislation who proposed that the bill "extinguishes the Indian title to a great domain." 420 U.S. at 440, 95 S.Ct. 1082. Moreover, the "surrounding circumstances" in *DeCoteau* were particularly compelling; spokesmen for the tribe were quoted in the local press in 1889 saying:

"We never thought to keep this reservation for our lifetime."

" . . . Now that South Dakota has come in as a state we have some one [sic] to go to, to right our wrongs. The Indians have taken their land in severalty. They are waiting for patents. The Indians are anxious to get their patents. We are willing the surplus land should be sold. We don't expect to keep reser-

vation [sic]. We want to get the benefit of the sale . . . ."

*Id.* at 433, 95 S.Ct. 1082.

■■■ The surrounding circumstances and legislative history of the 1854 Treaty are not as telling as those observed in *DeCoteau.* Nonetheless, they do give the court insight as to the goals the government sought to achieve through the treaty. The court recognizes that "[w]hen interpreting a treaty, the intention of the Indians and the intention of the government are both considered." *Absentee Shawnee Tribe,* 862 F.2d at 1417. But in this case, there is little, if any, evidence of the intent of the government and the Tribe at the time they signed the treaty. The only evidence available centers on the months before Commissioner Manypenny reached an agreement with the Tribe.

In 1853, Congress authorized the President of the United States to negotiate with the Indian tribes west of Missouri and Iowa "for the purpose of 'securing the assent of said tribes to the settlement . . . upon the lands claimed by said Indians, and for the purpose of extinguishing the title of said Indians, in whole or in part, to said lands . . .' " *Absentee Shawnee Tribe,* Dkt. 334, Ind. Cl. Comm., at 379 (quoting 10 Stat. at 238). Pursuant to this authority, the President designated Commissioner Manypenny to conduct the necessary negotiations. *Id.* Commissioner Manypenny was unable to reach agreement with the Shawnee Tribe in 1853, however, because the Tribe wanted to retain a portion of its reservation. *Id.* at 380. In 1854, Commissioner Manypenny was able to reach agreement with the Tribe, under the condition that the Tribe would retain 200,000 acres of its land. *Id.* at 381–82.

As noted previously in this Memorandum and Order, Congress required amendments before ratifying the 1854 Treaty. The signatories to the Treaty then ap-

proved the amendments. Congress changed the language of Article 2 to cede the entire 1.6 million acre tract to the United States before the United States receded 200,000 acres to the Shawnee Tribe for the selection of allotments.

Both the court and the parties have extensively searched Congressional records for additional information regarding the Article 2 amendments. The amendments, apparently crafted by the Committee on Indian Affairs, were reported to the Senate on August 2, 1854, and unanimously approved without recorded debate. 9 S. Exec. J. 377 (Aug. 2, 1854). Any transcripts of discussion regarding the treaty were "printed in confidence for the use of the Senate." 9 S. Exec. J. 358 (July 15, 1854); 9 S. Exec. J. 345 (June 29, 1854). Commissioner Manypenny did, however, report to the Senate his desire to craft a treaty that would dissolve the reservation. In his Report of the Commissioner of Indian Affairs dated November 26, 1853, Commissioner Manypenny advised the Senate:

> [M]any tribes expressed their willingness to sell [Indian territory], but on the condition that they could retain tribal reservations on their present tracts of land. This policy was deemed objectionable, and not to be adopted if it could be avoided; and with such tribes the time of treating was deferred until next spring, with the hope that the Indians by that time might see that their permanent interests required an entire transfer of all their lands and their removal to a new home.... The idea of retaining reservations, which seemed to be generally entertained, is not deemed to be consistent with their true interests, and every good influence ought to be exercised to enlighten them on the subject. If they dispose of their lands, no reservations should, if it can be avoided, be granted or allowed.... But to make reservations for an entire tribe on the tract which it now owns, would, it is believed,

> be injurious to the future peace, prosperity, and advancement of these people. The commissioner, as far as he judged it prudent, endeavored to enlighten them on this point, and labored to convince them that it was not consistent with the true interest of themselves and their posterity that they should have tribal reservations within their present limits.

S. Doc. No. 1, at 249–50 (1st Sess.1854). While Commissioner Manypenny's goals with respect to Indian reservations are insufficient, standing alone, to support a finding that Congress intended to terminate the Shawnee reservation, evidence that Congress was aware of his goals is persuasive.

◼ The Tribe argues that the 1854 Treaty must be read in context with the 1831 Treaty. In *Oyler v. Allenbrand,* the Tenth Circuit noted that Article X of the 1831 Treaty pledged that the Shawnee lands would never be subject to state law or within the bounds of any state. The court "found no evidence that this treaty has ever been formally abrogated." *Oyler,* 23 F.3d 292, 295 (10th Cir.1994). The 1831 Treaty specifically stated that:

> The lands granted by this agreement and convention to the said band or tribe of Shawnees, shall not be sold nor ceded by them, except to the United States. *And the United States guarantee that said lands shall never be within the bounds of any State or territory, nor subject to the laws thereof;* and further, that the President of the United States will cause said tribe to be protected at their intended residence, against all interruption or disturbance from any other tribe or nation of Indians, or from any other person or persons whatever, and he shall have the same care and superintendence over them, in the country to which they are to remove, that he

as heretofore had over them at their present place of residence.

Treaty With The Shawnee, 1831, August 8, 1831, U.S.-Shawnees, art. X, 7 Stat. 355 (emphasis added).

The court declines to hold that the 1831 promise remained binding after 1854. Article 11 of the 1854 Treaty provided that the United States would pay the Shawnees $27,000 "in full satisfaction not only of such claim [for damage to crops, stock, etc. from emigration] but of all others of what kind soever, and in release of all demands and stipulations arising under former treaties, with the exception of perpetual annuities...." By the plain language of the 1854 Treaty, the Shawnees released the United States of its prior commitment to exclude the Shawnees' lands from becoming part of a State.

The Supreme Court considered a similar situation in *DeCoteau*. The Court observed that the Sioux had entered into a prior treaty that "granted the tribe a permanent reservation in the Lake Traverse area, and provided for tribal self-government under the supervision of federal agents." 420 U.S. at 431, 95 S.Ct. 1082. Despite this promise, the Court concluded that there was no reservation with respect to any of the Sioux land. Again, *DeCoteau* supports this court's decision in the instant case.

In sum, the court concludes that the legislative history and surrounding circumstances of the 1854 Treaty and its ratification support a determination that Congress terminated the Shawnee reservation in 1854.

### c. Subsequent References to Land

■ The Tribe's final argument has equitable overtures. Essentially, the Tribe wants the court to recognize a reservation encompassing the SFAAP because through the years, it claims that the GSA and the courts have acknowledged that a reservation exists. The court declines to do so.

The Supreme Court, the Tenth Circuit, and this court have all made reference to the effect of the 1854 Treaty on the Shawnee reservation in *dicta*. In *Kansas Indians*, the Supreme Court referred to the 200,000 acres as the "re-ceded or reserved tract." 72 U.S. at 740; *see also Walker v. Henshaw*, 16 Wall. 436, 83 U.S. 436, 443–44, 21 L.Ed. 365 (1872) (referring to the 200,000 acres as "reserved as homes for the Shawnee people" and as a "reservation"). In *Absentee Shawnee Tribe*, the Tenth Circuit stated that "we must interpret the 1854 Treaty, which *established* a reservation for the Shawnees," and that the 1854 Treaty "reduced the territorial limits of the Shawnee reservation." 862 F.2d at 1417, 1419 (emphasis added) (citing *Kansas Indians*, 72 U.S. at 753, 72 U.S. 737); *see also United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 546 (10th Cir.2001) ("Part of this facility occupies land that was previously included in an Indian reservation *created by* the 1854 Treaty with the Shawnee.") (emphasis added). And in *United Tribe of Shawnee Indians v. United States*, this court stated as factual background that "[a] portion of Sunflower was previously part of an Indian reservation *created by* the Treaty with the Shawnee, 10 Stat. 1053 (1854)." 55 F.Supp.2d 1238, 1241 (1999) (emphasis added).

The court determines that none of these statements are dispositive on the issue of whether the Treaty of 1854 terminated the Shawnee reservation. The Tenth Circuit has recognized that "paradoxical references to [an] area as a reservation must be heavily discounted as convenient colloquialisms" when the context dictates. *Pittsburg & Midway Coal Mining*, 909 F.2d 1387, 1409 (10th Cir.1990).

The Tribe next argues that the GSA itself has previously confirmed that the SFAAP lies entirely within the Shawnee reservation. Any previous comments by the GSA or an independent contractor working for the GSA are not dispositive on the issue whether, by law, the SFAAP fell within a Shawnee reservation.

The Tribe next contends that the language in several pieces of legislation reinforces the continued existence of the Shawnee reservation. Section 19 of the 1854 Organic Act provides in part:

> That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with an Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Kansas until said tribe shall signify their assent to the president of the United States to be included within the said territory of Kansas. . . .

Organic Act, An Act to Organize the Territory of Kansas, 10 Stat. 283 (May 30, 1854), as quoted in K.S.A. Constitutions vol. at 1 (1988). Section 1 of the 1861 Act for Admission contains similar language:

> That nothing contained in the said constitution respecting the boundary of said state shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with such Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the state of Kansas until said tribe shall signify their assent to the president of the United States to be included within the state. . . .

An Act for the Admission of Kansas into the Union, 12 Stat. 126 (Jan. 29, 1861), as quoted in K.S.A. Constitutions vol. at 9 (1988).

The Tribe also points to the language that Congress used in enacting the Shawnee Tribe Status Act of 2000: "[I]t is in the best interests of the Shawnee Tribe and the Cherokee Nation that the Shawnee Tribe be restored to its position as a separate federally recognized Indian tribe and all current and historical responsibilities, jurisdiction, and sovereignty as it relates to the Shawnee Tribe, the Cherokee-Shawnee people, and their properties everywhere. . . ." 25 U.S.C. § 1041.

The above-quoted references to Indian territory and Shawnee properties are vague and insufficient to establish that the Shawnee reservation remained intact after the Treaty of 1854. Both Kansas statutes provide that the Indian rights will be recognized only "so long as such rights shall remain unextinguished by treaty between the United States and such Indians." 12 Stat. 126; 10 Stat. 283. They further provide that the State or Territory of Kansas would not "include any territory which, by treaty with such Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory." *Id.* In the 1854 Treaty, the Tribe agreed to sell the entire Shawnee reservation to the United States, and agreed that lands thereafter would be allotted or sold as public lands, thereby evincing the consent of the Tribe to be included within the State or territory.

Again, the court is not persuaded by the Tribe's arguments that the SFAAP has been treated as part of a reservation over the years. While several courts have referenced the 1854 Treaty and its effect on the Shawnee reservation, all of the references were *dicta* and non-binding on this court. The Tribe's other arguments must fail based on the court's determination that the 1854 Treaty extinguished the Shawnee reservation.

Absent a determination that the Shawnee reservation survived the 1854 Treaty, the court cannot conclude that the GSA was acting outside the scope of its authority when it denied the Tribe's § 523 transfer request. Accordingly, the court affirms the agency's decision, and the Tribe's request for relief is denied.

### 2. Arbitrary, Capricious, and an Abuse of Discretion

 The Shawnee Tribe next argues that the court should reverse the GSA's decision because the agency failed to fully consider the § 523 transfer request and failed to offer an explanation for its decision, which was contrary to evidence before the agency. *See Olenhouse,* 42 F.3d at 1574. The Tribe contends that the GSA made a predetermined financial and political decision that it was not going to transfer the SFAAP land, regardless of the merits of the Shawnees' claim or the statutory mandates. The court disagrees.

The Tribe attacks the GSA's decision on several bases: (1) the GSA ignored each of the Tribe's requests for transfer and continued with its disposal process; (2) the GSA "signaled" to the BIA the decision it wanted when it asked the BIA to make a "post haste" determination regarding the SFAAP; (3) the DOI's December 6, 2002 letter to the GSA cited no evidence in the

record to support its conclusion; (4) the government has withheld the documents supporting its decision based on attorney-client privilege; and (5) the fact that the GSA had potential lucrative contracts involving the land and the fact that Governor Bill Graves wrote to the Secretary of the Interior expressing his strong opposition to the Tribe's claim show that the GSA's decision was financially and politically based.

Extensive discussion of these arguments is unnecessary. The court has determined that the GSA made the correct decision when it declined to transfer the SFAAP to the BIA to be held in trust for the Tribe. The court has also reviewed the correspondence between the parties in this case and other evidence revealing the relationship between the parties, and concludes that the manner in which the GSA made its decision was not arbitrary or capricious.

### B. Motion to Dismiss

The Tribe has brought several other claims against Defendants.[4] First, the Tribe seeks injunctive and declaratory relief. Specifically, the Tribe asks the court to declare that Defendants' refusal to transfer the SFAAP to the Shawnee Tribe is unreasonable, arbitrary, and capricious, and to enjoin Defendants from transferring the SFAAP to any other federal or non-federal entity, other than to the DOI to be held in trust for the benefit of the Tribe.

Second, the Tribe claims that Defendants breached their fiduciary duties by: (1) refusing to act on the Tribe's transfer requests; (2) refusing to stay proceedings pending review of the requests; (3) failing to represent the best interests of the Tribe; (4) allowing sham transactions to

---

4. The Tribe agreed in its response to Defendants' motion to dismiss to voluntarily dismiss Count IV of its complaint.

dispossess the Shawnees of their land; (5) failing to notify the Shawnees of the surplus status of the SFAAP; (6) allowing the SFAAP to be contaminated and environmentally challenged; and (7) failing to keep current records of federally-recognized Indian tribes.

Finally, the Tribe claims that they were deprived of due process under the Constitution by the arbitrary and capricious actions of Defendants.

All of the Tribe's claims are dependent upon the court finding that the 1854 Treaty did not terminate the Shawnee reservation. The Tribe admits in its response to Defendants' motion to dismiss that "the underlying basis for the Shawnee Tribe's Non–APA claims are premised [sic] on the final adverse agency decision of the GSA to deny transfer of SFAAP to the DOI to be held in trust for the benefit of the Shawnee Tribe." Because the court has held against the Tribe on this issue, the other claims are moot. Defendants' motion to dismiss or for summary judgment is therefore granted with respect to the remaining claims.

IT IS, THEREFORE, BY THE COURT ORDERED that the GSA acted within the scope of its authority when it denied the Tribe's § 523 transfer request. The denial was not arbitrary, capricious, or an abuse of discretion because Congress terminated the Shawnee reservation when it ratified the 1854 Treaty.

IT IS FURTHER ORDERED that the Tribe's motion for a preliminary injunction (Doc. 13) is denied as moot.

IT IS FURTHER ORDERED that Defendants' motion to dismiss or for summary judgment (Doc. 51) is granted because the remainder of the Tribe's claims are moot.

Copies or notice of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**

The case is closed.